Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/07/2025 08:10 AM CST

State of Nebraska, appellee, v.
Michael E. Goynes, Jr., appellant.
___ N.W.3d ___

Filed February 7, 2025.    No. S-24-289.

1. **Postconviction: Pleadings.** The allegations in a motion for postconviction relief must be sufficiently specific for the district court to make a preliminary determination as to whether an evidentiary hearing is justified.

2. ____: ____. A postconviction motion that lacks the specific factual allegations necessary to support the claims made is no more than a fishing expedition for evidence that might aid in obtaining postconviction relief and is therefore insufficient to warrant an evidentiary hearing.

3. **Postconviction.** An evidentiary hearing is not required when a motion for postconviction relief alleges only conclusions of fact or law without supporting facts.

4. **Postconviction: Constitutional Law: Proof.** An evidentiary hearing on a motion for postconviction relief is required on an appropriate motion containing factual allegations which, if proved, constitute an infringement of the movant's rights under the Nebraska or federal Constitution—unless the records and files affirmatively show that the defendant is entitled to no relief.

5. ____: ____: ____. An evidentiary hearing is required on a motion for postconviction relief unless: (1) the motion does not contain factual allegations which, if proved, constitute an infringement of the movant's constitutional rights rendering the judgment void or voidable; (2) the motion alleges only conclusions of fact or law without supporting facts; or (3) the records and files affirmatively show that the defendant is entitled to no relief.

6. **Constitutional Law: Effectiveness of Counsel.** A proper ineffective assistance of counsel claim alleges a violation of the fundamental constitutional right to a fair trial.

7. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

8. ____: ____. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

9. **Effectiveness of Counsel: Presumptions.** Courts give counsel's acts a strong presumption of reasonableness.

10. **Effectiveness of Counsel: Proof: Words and Phrases.** To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

11. **Proof: Words and Phrases.** A reasonable probability is a probability sufficient to undermine confidence in the outcome.

12. **Trial: Effectiveness of Counsel: Appeal and Error.** When considering the prejudice prong of ineffective assistance of counsel, appellate courts focus on whether a trial counsel's deficient performance renders the result of the trial unreliable or fundamentally unfair.

13. **Appeal and Error.** Except for instances of plain error, only those issues both raised or passed upon below and specifically assigned and specifically argued on appeal will be considered by the appellate court.

14. **Trial: Effectiveness of Counsel: Appeal and Error.** Counsel's failure to preserve at trial an issue for direct appeal can be ineffective assistance of counsel only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. The failure to preserve an issue for appellate review is not, standing alone, ineffective assistance of counsel.

15. **Appeal and Error.** Under the law-of-the-case doctrine, an appellate court's holdings on issues presented to it conclusively settle all matters ruled upon, either expressly or by necessary implication.

16. **Postconviction: Appeal and Error.** A motion for postconviction relief cannot be used to secure a further review of issues already litigated on direct appeal.

17. **Evidence: Appeal and Error.** Evidence objected to which is substantially similar to evidence admitted without objection results in no prejudicial error.

18. **Postconviction: Appeal and Error.** In an appeal from the denial of postconviction relief, an appellate court will not consider for the first time on appeal claims that were not raised in the verified motion.

19. **Appeal and Error.** Appellate courts do not generally consider arguments and theories raised for the first time on appeal.
20. **Effectiveness of Counsel.** Decisions about whether to engage in cross-examination, and, if so, to what extent and in what manner, are strategic in nature and generally will not support an ineffective assistance claim.
21. **Constitutional Law: Effectiveness of Counsel.** The simple assertion that defense counsel could have performed better is not grounds to conclude defense counsel was constitutionally deficient.
22. **Appeal and Error.** Alleged errors of the lower court must be both specifically assigned and specifically argued in the brief of the party asserting the errors to be considered by an appellate court.

Appeal from the District Court for Douglas County, PETER C. BATAILLON, Judge. Affirmed.

Jason E. Troia, of Dornan, Troia, Howard, Breitkreutz, Dahlquist & Klein, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Melissa R. Vincent, for appellee.

FUNKE, C.J., MILLER-LERMAN, CASSEL, STACY, PAPIK, and FREUDENBERG, JJ.

FREUDENBERG, J.

## I. INTRODUCTION

The defendant appeals from the denial, without an evidentiary hearing, of his motion for postconviction relief seeking to set aside his convictions of murder in the first degree and use and possession of a deadly weapon. The defendant alleged in his motion that trial counsel was ineffective for failing to object to printouts of data extracted from his cell phone, pursuant to a warrant that we held on direct appeal satisfied the requirements of the Fourth Amendment and article I, § 7, of the Nebraska Constitution.[1] The defendant's remaining allegations concern the alleged ineffectiveness of trial counsel for counsel's failing to (1) call an additional witness to testify the defendant was at a barbecue around the time of the crime, (2)

---

[1] See *State v. Goynes*, 303 Neb. 129, 927 N.W.2d 346 (2019).

better cross-examine the State's eyewitness' identification of the defendant as the shooter, (3) more effectively challenge the alleged shortcomings in law enforcement's investigation of other suspects, and (4) better emphasize the lack of evidence linking the defendant to the murder weapon. We affirm.

## II. BACKGROUND

Michael E. Goynes, Jr., was convicted of murder in the first degree, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. Goynes was sentenced to life imprisonment for murder in the first degree, 45 to 50 years' imprisonment for use of a deadly weapon to commit a felony, and 20 to 25 years' imprisonment for possession of a deadly weapon by a prohibited person.

### 1. Trial

Goynes' convictions stem from the shooting death of Barbara Williams on April 25, 2016, in front of an apartment complex in Omaha, Nebraska. The shooter, a Black male, arrived in a white four-door sedan, exited the sedan, and began shooting as he approached where Williams was sitting on the front stoop of the complex. She was sitting with two people known as Action and Stay Ready, who were presumed to be the intended targets.

In less than 30 seconds, the shooter fired at least 10 rounds of ammunition in Williams' direction, returned to the sedan, and drove away. Security footage from the area showed that the shooter arrived and exited the sedan at 4:23:20 p.m. He returned to the sedan and fled the scene at 4:23:42 p.m. The sedan was seen exiting the area at 4:23:50 p.m. The sedan was never identified, and its owner was never found. No evidence was presented tying Goynes to the weapon used in the shooting, which was not recovered until some months after the shooting.

Goynes' principal defense was an alibi that he was at a barbecue with friends at the time of the shooting. Several photographs from the barbecue were entered into evidence. The

first photograph showing Goynes at the barbecue was time-stamped at approximately 4:29 p.m. It was not disputed that Goynes was at the barbecue at that time. The State's theory was that Goynes did not arrive at the barbecue until 4:29 p.m. and that he had time to get there from the time of the shooting. The State presented evidence that the barbecue was 2.8 miles from the scene of the shooting and that it took only approximately 4½ minutes to drive from the scene of the shooting to the barbecue, assuming the driver obeyed all traffic laws.

There were conflicting eyewitness accounts of the identity of the shooter. Two eyewitnesses knew Goynes and testified he was the shooter. When the shooting occurred, Goynes was a young man of average size with lighter brown skin, a beard, and short hair without braids or dreadlocks. An eyewitness who did not know Goynes identified the shooter as being young and average size, with a beard, short hair, and lighter brown skin. However, at least one eyewitness said a short, young, and thin male with a very dark complexion and dreadlocks was the shooter. There were several reports to law enforcement at the scene that a man with dreadlocks had been in a fight at the complex the night before the shooting.

### (a) Eyewitnesses George Taylor and Saville Hawthorne

George Taylor and Saville Hawthorne both testified for the State at trial. They testified that they witnessed the shooting and could identify Goynes, also known as Gang Bang, as the shooter. Taylor and Hawthorne lived together in an apartment building facing the building where Williams was shot. When Williams was killed, they were sitting in the front seat of their vehicle, facing the stoop where Williams was sitting.

Goynes is Hawthorne's cousin, and she knew him from family gatherings. Defense counsel adduced, however, that Hawthorne had not seen Goynes in the 2 years prior to the shooting. Taylor testified he had seen Goynes twice in the 2 weeks before the shooting, driving by the complex. Before that, he had seen Goynes' picture on the news with Goynes'

name underneath the picture. He had never met Goynes in person. Hawthorne testified that when she learned Goynes had been driving through the neighborhood, she called Goynes' mother and warned her that Goynes should "stop coming through the neighborhood like that [be]cause people are either looking for him or they weren't getting along," and she did not want Goynes to get in trouble.

Both Taylor and Hawthorne testified that Goynes looked directly at them at some point during the shooting. Taylor testified that he recognized Goynes when he "locked eyes" with him during the shooting. Taylor immediately exited the vehicle and took cover behind a building. Hawthorne testified that as Goynes was walking back to the sedan following the shooting, he looked in their direction to where "people was ducking and trying to get away," and he "looked dead at me." That was when she recognized that Goynes was the shooter.

Both Taylor and Hawthorne admitted they did not identify Goynes to law enforcement when questioned at the scene. Taylor testified that although he did not identify Goynes as the shooter, he had indicated to law enforcement at the scene that he "might know something but right now wasn't the time to talk about it in front of everybody." About 30 people were present by that time, and none of them were being cooperative with law enforcement. Taylor testified he was concerned for himself if he was seen talking to law enforcement and for Hawthorne if it was revealed in front of the witnesses that she was the shooter's cousin. Taylor explained that law enforcement was called to the area several times a day and that people in the neighborhood believed one should "[n]ever cooperate with the law." It was not until 4 days later that Taylor reached out to law enforcement and reported what he had witnessed.

Hawthorne similarly explained that when questioned by law enforcement at the scene, she did not tell them who the shooter was. She said, "[T]here was so many people out, that's just something you don't do around people." She was afraid

of retaliation. Four days later, she reached out to law enforcement to report to them that Goynes was the shooter.

During cross-examination of Taylor, Taylor repeated prior testimony that he has a prescription for glasses to correct nearsightedness and had consumed two beers while sitting in his vehicle. Defense counsel also adduced testimony reiterating that Taylor had never met Goynes, talked to Goynes in person, or been at the same social event as Goynes.

Defense counsel confronted Taylor with his statement to law enforcement during Taylor's interview 4 days after the shooting that Taylor could not be sure if Goynes had any facial hair, because he "didn't see [Goynes'] face like that." This was later confirmed during defense counsel's cross-examination of the detective who interviewed Taylor. The detective elaborated that Taylor said he "wasn't up on [Goynes] like that," referring to the fact that he was not that close to Goynes.

During cross-examination of Hawthorne, defense counsel confronted her with her initial statements to law enforcement on the scene that the shooter was an "unknown [B]lack male" with "braids down to his shoulders." Hawthorne testified she did not remember making that statement. Defense counsel then attempted to adduce testimony that Hawthorne knew there had been a fight at the complex the night before the shooting between "Action" and someone with dreadlocks and asked Hawthorne if she had made such a statement during a deposition. Hawthorne stated she did not remember telling law enforcement of a fight involving someone with dreadlocks but stated that "[t]here was always fights" at the complex.

Both during the case in chief and during the defense, defense counsel adduced evidence that in her interview with law enforcement, Hawthorne was shown a photograph of "Stay Ready" and had mistakenly identified the person in the photograph as Goynes when he was younger.

Defense counsel later called as witnesses two law enforcement officers who interviewed Hawthorne at the scene. One officer testified that Hawthorne provided a description of the

shooter as a Black male with shoulder-length dreadlocks. He explained that the police report said "braids" and that he considered braids and dreadlocks to be the same thing. The other officer said that Hawthorne gave a description of the shooter as an unknown Black male and described his clothing.

During opening statements, defense counsel emphasized that neither Taylor nor Hawthorne told law enforcement on the day of the shooting that the shooter was Goynes. In fact, explained defense counsel, Hawthorne talked to law enforcement on the day of the shooting and described the shooter as having braids, which Goynes did not have at the time of the shooting. During closing, defense counsel emphasized that Taylor was not very familiar with Goynes, was not wearing his glasses when the shooting occurred, and was hiding during a good portion of the shooting.

Defense counsel emphasized during closing arguments that Hawthorne appeared to have "extremely poor memory and recollection," explaining that during questioning, she said, "'I don't know'" or "'I don't remember'" "too many times to count." Defense counsel emphasized Hawthorne's original description to law enforcement of the shooter's having long braids and her misidentification of the photograph of "Stay Ready" as Goynes.

### (b) Someone With Braids or Dreadlocks

Law enforcement witnesses testified at trial that they learned from interviewing residents of the complex on the day of the shooting that there had been a physical altercation at the complex the night before. That altercation involved an individual whose dreadlocks were pulled from his head during the fight.

Defense counsel adduced evidence that, after the shooting, two different sections of dreadlocks were discovered by law enforcement at the complex. One was found in a laundry room, and the other was found in a courtyard. Defense counsel adduced testimony that law enforcement had marked and photographed the dreadlocks for evidence.

During cross-examination, Det. Larry Cahill testified that at the scene of the shooting, five people gave law enforcement their names, as well as a description of the shooter. Defense counsel also adduced that there were at least six other witnesses to the shooting who gave their names to law enforcement at the scene. Cahill admitted that law enforcement did not endeavor to ask any of the witnesses to look at a photographic lineup of suspects.

Following the State's case in chief, the defense called Andrea Brooks, one of the eyewitnesses to the shooting. She testified that she saw the shooter as he was walking back to the sedan after the shooting. The shooting began while she was in the shower inside her apartment, and she went to the window to see what was happening. She described the shooter as "extremely dark skinn[ed]" with short dreadlocks, and "small of stature." She testified that she gave this description to law enforcement at the scene.

When Brooks found out that Goynes had been arrested, she contacted law enforcement. She testified, "I'm like, I don't think they have the right man because how could they know this man shot, this — this man, when they never called any of the witnesses out to identify him. So I'm like, how could they know this was the right man?" She elaborated, "[M]e and — me and a few people were like, well, how did they find him when we didn't even come out and do a witness lineup or anything."

After Goynes' arrest, Brooks was brought in to look at one photograph of a suspect whom she did not recognize. When defense counsel pointed out Goynes, present at trial, Brooks affirmed she did not see Goynes the day of the shooting and did not know him at all. Brooks testified that it seemed law enforcement "just randomly pick[ed] somebody" because "it's a [B]lack on [B]lack crime," so "[t]hey want to solve it, shut it down, instead of picking the right person that did the murder."

On redirect, the State called the law enforcement officers who had contact with Brooks at the scene. One officer testified that Brooks said she had not seen the shooter. The other officer testified that Brooks described the shooter as a "dark-skinned [B]lack male" but that she did not describe braids or dreadlocks.

In opening statements, defense counsel told the jury that one of the tenants of the complex would testify that she saw the shooter returning to the sedan and that he had dreadlocks, which Goynes did not have at the time of the shooting. In closing arguments, defense counsel suggested that the investigation was biased against Goynes.

### (c) Cell Phone

Over Goynes' objection, the trial court admitted into evidence Goynes' cell phone and a compact disc containing data extracted from the cell phone, pursuant to a search warrant. Without objection at trial, the court also admitted into evidence printed copies of select datasets of the information contained on the cell phone and compact disc.

Before trial, the court had overruled Goynes' motion to suppress all evidence obtained from the search of his cell phone records, which Goynes argued in his motion that such search was conducted in violation of the 4th, 5th, and 14th Amendments to the U.S. Constitution and article I, §§ 3, 7, 11, and 12, of the Nebraska Constitution. The trial court found that the search warrant for the content of Goynes' cell phone was supported by probable cause and was sufficiently particular concerning the data to be searched. The court found that the officers exercised good faith in performing the search.

According to the cell phone exhibits, there was a pause in internet usage on Goynes' cell phone between 3:38 p.m. and 4:19 p.m. on the day of the shooting. Then, at 5:10 p.m., Goynes visited the website of a local television news station and viewed an article about the shooting. At 9:15 p.m., Goynes again viewed an article about the shooting. Five days later, the day Goynes turned himself in, he searched his

name on various websites and accessed an article related to the shooting.

### (d) Murder Weapon

There was testimony that a single handgun was used to fire approximately 10 rounds of ammunition at the scene of the crime. The weapon used in the shooting was not located until several months later. It was in the possession of Andrell Harris. Harris testified at trial that he purchased the gun during a dice game at his cousin's house at the end of April 2016 toward the beginning of May.

Harris could not identify whom he had purchased the gun from. There was no evidence of fingerprints or DNA linking the gun to Goynes. There were no eyewitness accounts linking the gun to Goynes, other than those who identified Goynes as the shooter who killed Williams.

During cross-examination, the State's witnesses testified they had reason to believe the gun was involved in four separate shootings in the recent past. At least one of those shootings occurred after Goynes was in custody. There was no indication Goynes was involved in any of the other shootings except for the one that killed Williams.

In opening statements, defense counsel noted that "the smoking gun [was] found in the pocket of . . . Harris" several months after the crime. Further, defense counsel argued that law enforcement was unable to connect the gun to Goynes, pointing out there would be no evidence of Goynes' fingerprints or DNA on the gun. In closing, defense counsel described the State's failure to link the murder weapon to Goynes as a "glaring hole[] in the State's case."

### (e) Barbecue Alibi

Goynes' girlfriend at the time of the shooting originally told law enforcement that Goynes was with her at her apartment the entire day of the shooting. She later said that Goynes was at a barbecue. She testified at trial that she had misremembered.

She had told law enforcement that Goynes told her to lie to be his alibi. During cross-examination, defense counsel adduced that she did not make said admission until being questioned by law enforcement in a "cold room" for an extended period of time.

The State entered into evidence photographs from the barbecue on the day of the shooting. The photographs were extracted from the cell phone of Travell Richard, who was established to have been at the barbecue but did not testify at trial. The photographs began at 4:27:43 p.m. However, the first photograph with Goynes in it is time-stamped 4:29:42 p.m.

Cahill testified that he drove between the location of the barbecue and the location of the shooting approximately 15 times to gauge how long it would take to drive from one place to the other, observing the speed limit and all the traffic signals. The approximate time was 4 minutes 20 seconds. However, there were a couple of times when it took Cahill approximately 7 to 9 minutes due to heavy traffic and the traffic light cycles. Other times were shorter.

Cahill admitted during cross-examination that of all the people shown in photographs to have been at the barbecue, law enforcement only interviewed one person other than Goynes. Another officer, who worked in the digital forensics squad, admitted during cross-examination that he was unable to pinpoint, using information from cell phone towers, Goynes' location around the time of the shooting.

Defense counsel called several witnesses to attest that Goynes was at the barbecue when the shooting occurred. There was testimony from these witnesses that the barbecue was a memorial and that Goynes stayed there until the group went together to a cemetery.

Dominick Hill, a friend of Goynes', testified that he rode with Goynes to the barbecue. Hill testified that he did not notice Goynes leave at any point and that he would have noticed.

Larry Goynes, Goynes' cousin, testified he arrived at the barbecue between 3:30 and 4 p.m., he never saw Goynes leave, and he would have noticed had Goynes left. Larry testified that he saw a silver vehicle that belonged to Goynes' girlfriend parked near the barbecue and that Goynes regularly drove that vehicle. During Larry's testimony, defense counsel asked him about someone in the courtroom with long dreadlocks who had been present during Hill's testimony. Larry explained that person was his brother, who was there to give Hill a ride home.

Da'Shawn Goynes, Goynes' brother, testified he rode with Larry to the barbecue and Goynes was there when he arrived. Da'Shawn testified that he knew Goynes did not leave the barbecue because Goynes was sitting right across from him at a table. Da'Shawn explained that Goynes rode with Larry and him from the barbecue to the cemetery around 4:50 p.m. Larry drove a maroon vehicle.

During opening statements, defense counsel emphasized that a photograph taken at 4:29 p.m. proved Goynes was at a "picnic" in a friend's backyard 6 minutes, at most, after the shooting. Defense counsel asked the jury, "[H]ow could [Goynes] commit this crime . . . and in less than six minutes later be sitting in the back yard at a picnic table, calmly sitting at a table surrounded by other people?" During closing, defense counsel asked why law enforcement did not question the numerous, identifiable individuals in the photographs from the barbecue to further investigate Goynes' alibi.

## 2. Direct Appeal

Goynes was represented by his trial counsel on direct appeal. His sole assignment of error on direct appeal was that the district court erred in failing to suppress cell phone data content acquired through the execution of a warrant that was allegedly unsupported by probable cause and insufficiently particular. In *State v. Goynes*,[2] we found no merit to this

---

[2] *Id.*

assignment of error, holding that the search warrant for the cell phone data content was supported by probable cause and met the particularity requirement of the Fourth Amendment and article I, § 7, of the Nebraska Constitution. We therefore concluded that the cell phone and the compact disc containing the cell phone data were properly admitted into evidence at trial over defense counsel's objection. We did not address the admissibility of the printouts representing a select dataset from the compact disc because Goynes had failed to object to their admission at trial, thereby failing to adequately preserve the issue for appellate review.

### 3. Motion for Postconviction Relief

Within 1 year of our decision, Goynes filed a verified motion for postconviction relief, alleging seven points of alleged ineffective assistance of trial counsel. Broadly, the allegations related to the admission of the printouts of cell phone data, the failure to call a witness who was at the barbecue, the failure to sufficiently challenge evidence and testimony admitted against him, and the failure to adequately challenge law enforcement's investigation of an unknown suspect with dreadlocks.

### (a) Printouts of Cell Phone Data

First, Goynes asserted his trial counsel was ineffective for failing to object at trial to the printouts of his cell phone data. He described that, pursuant to a search warrant, law enforcement recovered evidence from his cell phone showing that, beginning within an hour of the shooting, he had searched for articles about it. Goynes noted that the district court had denied defense counsel's motion to suppress information derived from the search warrant, with the court finding that the warrant was supported by probable cause and provided sufficient particularity and thus was exercised in good faith. Goynes alleged in his motion for postconviction relief that but for failing to object to the printouts, "Goynes would have received a different result in that the Nebraska Supreme Court could have addressed the issue."

### (b) Cross-Examination of
### Hawthorne's Identification

Second, Goynes alleged trial counsel was ineffective by failing to "sufficiently challenge" Hawthorne and to impeach the credibility of her identification of Goynes as the shooter several days after the shooting. Such impeachment allegedly should have been made based on Hawthorne's initial statement to law enforcement at the scene that she did not know the shooter's identity, as well as her description of the shooter's appearance that was inconsistent with Goynes' appearance at the time of the shooting. Furthermore, trial counsel allegedly should have sufficiently challenged Hawthorne's "selective memory" when she testified at trial that she was unable to recall her initial statements to law enforcement. Finally, Goynes pointed out that Hawthorne had misidentified a photograph of "Stay Ready" as Goynes. According to Goynes, had trial counsel been more effective in his cross-examination of Hawthorne, "her credibility would have been impeached and he would have been found not guilty by the jury on all counts."

### (c) Cross-Examination of
### Taylor's Identification

Third, Goynes alleged trial counsel was ineffective by failing to "sufficiently challenge" the eyewitness testimony of Taylor, which allegedly would have impeached his credibility in identifying Goynes as the shooter. In this regard, Goynes described that Taylor initially refused to speak with law enforcement but later contacted law enforcement and said Goynes was the shooter.

### (d) Dreadlocks Investigation

Fourth, Goynes alleged trial counsel was ineffective by failing to sufficiently challenge at trial the alleged lack of an adequate law enforcement investigation of the dreadlocks left at the scene of the murder during an altercation that occurred the day before the shooting. Goynes elaborated those

witnesses reported that the person involved in the fight had threatened to be back.

Goynes pointed out that defense counsel had filed a notice of intent to present hearsay statements to law enforcement from witnesses Cominque Smith, Michelle Broadnax, Alvina Marion, and Shawntina Wynn. According to the motion for postconviction relief, Broadnax reported there had been a man with dreadlocks who was involved in a fight the day before the shooting and said he would be back. Marion allegedly reported that there was a fight the day before the shooting involving a Black male with long dreadlocks, and she gave a description of the shooter that did not match Goynes' size at the time of the shooting. Smith allegedly reported that the shooter was short, young, and thin. Goynes alleged that "the police did not do a sufficient investigation in the dreadlocks, and his counsel failed to adequately expose this shortcoming during trial" and "had his counsel done so, he would have been found not guilty at trial on all counts."

#### (e) Murder Weapon

Fifth, Goynes alleged trial counsel was ineffective for failing to "adequately pursue a defense and challenge the evidence concerning the murder weapon." Goynes pointed out that the murder weapon was found in someone else's possession and that Goynes' DNA was not found on the weapon. Goynes asserted, "Trial counsel was ineffective in failing to pursue a defense related to the circumstances of finding the murder weapon."

#### (f) Not Calling Richard As Alibi Witness

Sixth, Goynes alleged trial counsel was ineffective for "fail[ing] to call . . . Richard as a witness for his alibi defense." Goynes alleged, "Richard was a necessary witness and could testify concerning Goynes' presence at the barbe[c]ue. Additionally Richard had photos on his phone of Goynes at the barbe[c]ue." Goynes did not allege trial counsel was ineffective for failing to offer photographs into evidence,

nor that there were photographs not entered into evidence, which would have shown Goynes was at the barbecue when Williams was murdered. Rather, he alleged more generally that "had Richard been called as a witness, the outcome would have been different in favor of Goynes as his alibi would have been established."

### (g) Cross-Examination of Cahill

Seventh, Goynes alleged trial counsel was ineffective for failing to challenge or impeach—with police reports stating it took between 7 and 9 minutes—the testimony of Cahill that it was approximately a 4-minute drive to travel between the barbecue and the scene of the shooting.

### 4. Order Denying Postconviction Relief

The district court denied the motion for postconviction relief without an evidentiary hearing.

The court reasoned that Goynes suffered no prejudice from his trial counsel's failure to object to the printouts of cell phone data because "the same logic and reasoning" of our decision on direct appeal holding that the trial court properly admitted the cell phone and cell phone data "would carry over to the printouts of the same information."

Regarding claimed failures to cross-examine or challenge the State's evidence, the court reasoned that because the record demonstrated "trial counsel cross-examined the witnesses consistent with the defense strategy of the case, filed numerous pretrial motions challenging the State's evidence, filed a motion-in-limine restricting the State from offering certain information, called their own witnesses to establish a defense theory, and strenuously argued numerous points during closing arguments," the record refuted that counsel was deficient for allegedly failing to meaningfully challenge the State's evidence or that Goynes suffered any prejudice. The district court elaborated that trial counsel cross-examined and attacked the credibility of Taylor, Hawthorne, and Cahill and cross-examined "witnesses about the firearm used in this case,

who was found with it, and establishing that [Goynes] was not a suspect in two other shootings in which that same firearm was used."

As for the alleged ineffective assistance in failing to call Richard as a witness supporting his alibi, the district court found that Goynes had not "met his burden" of establishing deficiency and prejudice. The court elaborated that Goynes had failed

> to establish a timeline for said barbe[c]ue, how . . . Richard's testimony could conclusively establish that [Goynes] was not at the scene of the crime at the time of the crime, or how . . . Richard's testimony could overcome the eye witness testimony of both Hawthorne and Taylor, each [of] whom placed [Goynes] at the scene of the crime, at the time of the crime, and committing the crime.

Furthermore, while defense counsel did not call Richard to testify, defense counsel submitted photographs and other evidence of Goynes' attendance at the barbecue and made "a cohesive argument in an attempt to establish an alibi."

## III. ASSIGNMENTS OF ERROR

Goynes assigns that the district court erred in denying postconviction relief and denying him an evidentiary hearing on the issues of his trial counsel's failures to (1) preserve his objection to the cell phone evidence, (2) subject the State's case to meaningful adversarial testing, (3) present a defense, and (4) call his alibi witness.

## IV. STANDARD OF REVIEW

In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief.[3]

---

[3] *State v. Jaeger*, 311 Neb. 69, 970 N.W.2d 751 (2022).

To the extent that cases such as *State v. Boeggeman*,[4] *State v. Harris*,[5] and *State v. Jensen*[6] suggest that even if we find in our de novo review that the defendant "failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights as to render the judgment void or voidable," we must also conduct an analysis of whether the files and records affirmatively show the defendant is entitled to no relief, we disapprove.

## V. ANALYSIS

Postconviction relief is described in Neb. Rev. Stat. § 29-3001 (Cum. Supp. 2024). Pursuant to § 29-3001(1), postconviction relief is available on the ground that there was such a denial or infringement of the rights of the prisoner as to render the judgment void or voidable under the Constitution of this state or the Constitution of the United States.

Under § 29-3001(1), a prisoner in custody under sentence "may file a verified motion, in the court which imposed such sentence, stating the grounds relied upon and asking the court to vacate or set aside the sentence." Section 29-3001(2) gives the right to a hearing "[u]nless the motion and the files and records of the case show to the satisfaction of the court that the prisoner is entitled to no relief."

[1-3] The allegations in a motion for postconviction relief must be sufficiently specific for the district court to make a preliminary determination as to whether an evidentiary hearing is justified.[7] A postconviction motion that lacks the specific factual allegations necessary to support the claims made is no more than a fishing expedition for evidence that might aid in obtaining postconviction relief and is therefore

---

[4] *State v. Boeggeman*, 316 Neb. 581, 590, 5 N.W.3d 735, 741 (2024).

[5] *State v. Harris*, No. A-23-718, 2024 WL 4821174 at *2 (Neb. App. Nov. 19, 2024) (selected for posting to court website).

[6] *State v. Jensen*, No. A-23-939, 2024 WL 3770410 at *3 (Neb. App. Aug. 13, 2024) (selected for posting to court website).

[7] *State v. Jaeger, supra* note 3.

insufficient to warrant an evidentiary hearing.[8] An evidentiary hearing is not required when a motion for postconviction relief alleges only conclusions of fact or law without supporting facts.[9]

[4,5] In contrast, an evidentiary hearing on a motion for postconviction relief is required on an appropriate motion containing factual allegations which, if proved, constitute an infringement of the movant's rights under the Nebraska or federal Constitution—unless the records and files affirmatively show that the defendant is entitled to no relief.[10] Stated another way, an evidentiary hearing is required on a motion for postconviction relief unless: (1) the motion does not contain factual allegations which, if proved, constitute an infringement of the movant's constitutional rights rendering the judgment void or voidable; (2) the motion alleges only conclusions of fact or law without supporting facts; or (3) the records and files affirmatively show that the defendant is entitled to no relief.[11]

[6,7] A proper ineffective assistance of counsel claim alleges a violation of the fundamental constitutional right to a fair trial.[12] To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[13] the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.[14]

[8,9] To show that counsel's performance was deficient, a defendant must show that counsel's performance did not

---

[8] See *id*.

[9] *State v. Stelly*, 308 Neb. 636, 955 N.W.2d 729 (2021).

[10] See *State v. McLeod*, 274 Neb. 566, 741 N.W.2d 664 (2007).

[11] See *State v. Jaeger, supra* note 3.

[12] *State v. Galindo*, 315 Neb. 1, 994 N.W.2d 562 (2023).

[13] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[14] *State v. Galindo, supra* note 12.

equal that of a lawyer with ordinary training and skill in criminal law.[15] Courts give counsel's acts a strong presumption of reasonableness.[16]

[10-12] To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[17] A reasonable probability is a probability sufficient to undermine confidence in the outcome.[18] When considering the prejudice prong of ineffective assistance of counsel, we focus on whether a trial counsel's deficient performance renders the result of the trial unreliable or fundamentally unfair.[19]

Goynes argues on appeal that the court erred in denying him postconviction relief without an evidentiary hearing on his claims that trial counsel was ineffective by failing to (1) object at trial to printouts of his cell phone data, (2) impeach Hawthorne's credibility based on her initial description of the shooter, (3) sufficiently challenge Taylor's identification of Goynes, (4) adequately expose at trial the shortcomings of law enforcement's investigation of dreadlocks found at the scene, (5) emphasize that the murder weapon was found in someone else's possession and that Goynes' DNA was not found on the weapon, and (6) call Richard to testify in order to substantiate his alibi "due to . . . Richard's involvement in the photo taking."[20]

[13] Goynes does not specifically assign and specifically argue any error relating to his postconviction allegation that trial counsel failed to impeach Cahill's testimony regarding

---

[15] *State v. Haas*, 317 Neb. 919, 12 N.W.3d 787 (2024).

[16] See *State v. Rush*, 317 Neb. 622, 11 N.W.3d 394 (2024), *modified on denial of rehearing* 317 Neb. 917, 12 N.W.3d 787.

[17] *State v. Haas, supra* note 15.

[18] See *State v. Rush, supra* note 16.

[19] *Id*.

[20] Brief for appellant at 16.

the amount of time it took to drive from the barbecue to the scene of the shooting. Therefore, we do not address the district court's ruling as to that allegation. Except for instances of plain error, only those issues both raised or passed upon below and specifically assigned and specifically argued on appeal will be considered by the appellate court.[21]

### 1. Printouts

Goynes' allegations in his motion for postconvicton relief concerning trial counsel's failure to object to the cell phone data printouts, even if true, do not constitute ineffective assistance of trial counsel. Therefore, the district court did not err in denying this claim without an evidentiary hearing.

[14] Goynes alleged that but for trial counsel's failure to object to the admission of the printouts at trial, we would have specifically addressed the issue of the admissibility of the printouts on direct appeal. Counsel's failure to preserve at trial an issue for direct appeal can be ineffective assistance of counsel only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal.[22] The failure to preserve an issue for appellate review is not, standing alone, ineffective assistance of counsel.

[15,16] Our holding that the cell phone data was constitutionally obtained is the law of the case. Under the law-of-the-case doctrine, an appellate court's holdings on issues presented to it conclusively settle all matters ruled upon, either expressly or by necessary implication.[23] A motion for postconviction relief cannot be used to secure a further review of issues already litigated on direct appeal.[24]

---

[21] *State v. Jaeger, supra* note 3.

[22] See *State v. Haynes*, 299 Neb. 249, 908 N.W.2d 40 (2018), *disapproved on other grounds, State v. Allen*, 301 Neb. 560, 919 N.W.2d 500 (2018).

[23] See *132 Ventures v. Active Spine Physical Therapy, ante* p. 64, 13 N.W.3d 441 (2024).

[24] See *State v. Stelly, supra* note 9.

Goynes did not allege how our conclusion on direct appeal as to the admissibility of the printouts would have been different from our holding that the cell phone and compact disc containing the data extracted from the cell phone were properly admitted over trial counsel's objections. The printouts were obtained by the same warrant that both this court and the trial court found was supported by probable cause and had sufficient particularity under the Fourth Amendment and article I, § 7, of the Nebraska Constitution.

[17] Goynes also fails to explain why we would have found the admission of the printouts prejudicial when the compact disc containing all the data extracted from the cell phone was deemed properly admitted. Evidence objected to which is substantially similar to evidence admitted without objection results in no prejudicial error.[25]

[18,19] For the first time on appeal, Goynes suggests he was prejudiced, even if on direct appeal we would have found no merit to a challenge to the admissibility of the printouts, because Goynes "would have had the ability to petition for a Writ of Certiorari with the United States Supreme Court on the same issue and pursue federal Habeas relief."[26] In an appeal from the denial of postconviction relief, we will not consider for the first time on appeal claims that were not raised in the verified motion.[27] Appellate courts do not generally consider arguments and theories raised for the first time on appeal.[28]

In any event, this argument lacks merit. Goynes does not argue he would have been successful in these federal avenues, and it is entirely speculative to conclude he would have been. Nothing in the allegations for postconviction relief changes our conclusion that the cell phone data was obtained in

---

[25] *In re Estate of Jeffrey B.*, 268 Neb. 761, 688 N.W.2d 135 (2004).

[26] Brief for appellant at 12.

[27] *State v. Munoz*, 309 Neb. 285, 959 N.W.2d 806 (2021).

[28] *Id*.

compliance with the Fourth Amendment and article I, § 7, of the Nebraska Constitution.

Goynes' inability to obtain appellate or federal review of the admissibility of the printouts, due to the failure of trial counsel to object to their admission, does not state a claim for an infringement of Goynes' constitutional rights rendering his convictions void or voidable.

### 2. CROSS-EXAMINATION OF TAYLOR AND HAWTHORNE

The records and files affirmatively show Goynes is entitled to no relief for his claim that trial counsel was ineffective by failing to "sufficiently challenge" Taylor's and Hawthorne's eyewitness accounts that Goynes was the shooter. Specifically, Goynes alleged Hawthorne's credibility could have been impeached by virtue of her initial statement to law enforcement that she did not know the shooter and the fact that she gave an initial description of the shooter that was inconsistent with Goynes' appearance at the time of the shooting. Further, Hawthorne's credibility could have been called into question by trial counsel's pointing out her inability at trial to recall what she initially said to law enforcement at the scene and her misidentification of a photograph of "Stay Ready" as Goynes. As for Taylor, Goynes pointed to the fact that he had initially refused to speak with law enforcement.

[20,21] The trial record shows that defense counsel cross-examined Taylor and Hawthorne on these grounds and many more. Defense counsel also adduced other witnesses' testimonies to further call into question the reliability of Taylor's and Hawthorne's identifications of Goynes as the shooter. Decisions about whether to engage in cross-examination, and, if so, to what extent and in what manner, are strategic in nature and generally will not support an ineffective assistance claim.[29] The simple assertion that defense counsel could have

---

[29] *State v. Wood*, 310 Neb. 391, 966 N.W.2d 825 (2021).

performed better is not grounds to conclude defense counsel was constitutionally deficient.[30]

### 3. MURDER WEAPON

Likewise, the trial record affirmatively shows that Goynes is entitled to no relief on the claim that trial counsel failed to adequately pursue a defense challenging the lack of evidence connecting him to the weapon and emphasizing the weapon was found in someone else's possession. Defense counsel pursued such a defense, stating that the "smoking gun" was found in Harris' pocket and that the State had presented no physical evidence, such as fingerprints or DNA, linking Goynes to the gun. Defense counsel described this as a "glaring hole[] in the State's case." Goynes does not explain what else defense counsel should have done. He simply states that the absence of his DNA on the weapon "should have [been] emphasized."[31] It was. To the extent Goynes claims trial counsel should have emphasized it more, this is not a basis for finding either deficient conduct or prejudice rendering his convictions void or voidable.

### 4. DREADLOCKS SUSPECT

[22] Regarding trial counsel's alleged failure to adequately expose the shortcomings of law enforcement's investigation of an alternative suspect with dreadlocks, his counsel states on appeal what "Goynes alleged"[32] in his postconviction motion but does not argue the trial court erred in denying an evidentiary hearing on those allegations. Alleged errors *of the lower court* must be both specifically assigned and specifically argued in the brief of the party asserting the errors to be considered by an appellate court.[33]

---

[30] *Id.*

[31] Brief for appellant at 15.

[32] *Id.* at 14.

[33] *State v. Dailey*, 314 Neb. 325, 990 N.W.2d 523 (2023).

Overlooking the form of Goynes' argument on appeal, we find that the district court did not err. Goynes seemed to suggest in his postconviction motion that trial counsel could have better exposed the shortcomings of law enforcement's investigation into the possibility that someone with dreadlocks was the shooter by calling Broadnax, Marion, and Wynn to testify that there was a fight at the complex the day before the shooting. Marion additionally would have testified that this fight involved a man with long dreadlocks, and Broadnax and Wynn would have testified that the man had made threats to come back. Smith allegedly would have testified he told law enforcement at the scene that the shooter was "'little and kind of short, skinny, in his early 20s, wearing a red shirt and shorts.'"

Trial counsel, in fact, made significant efforts at exposing the shortcomings of law enforcement's investigation into the possibility that someone with dreadlocks was the shooter. Hawthorne testified at trial that the shooter had long dread-locks, and evidence was adduced of her report of the same to law enforcement. Additionally, defense counsel emphasized at trial that Hawthorne had initially reported the shooter had long dreadlocks. Trial counsel even pointed suspicion to Larry's brother, who was in the courtroom and had long dreadlocks.

Trial counsel emphasized that law enforcement conducting the canvass of the area of potential witnesses had learned there was a physical altercation at the complex the night before the shooting involving an individual who had dreadlocks pulled from his head during the fight. Those dreadlocks were found at the scene of the shooting and marked as evidence in the criminal investigation. Defense counsel questioned Cahill regarding law enforcement's failure to show a photographic lineup to the eyewitnesses to the shooting.

Defense counsel called Brooks, who testified the shooter did not in any way resemble Goynes. She described the shooter as "extremely dark skinn[ed]" with short dreadlocks and "small

of stature." She passionately opined that law enforcement failed to adequately pursue finding the real shooter. In closing arguments, defense counsel asserted that law enforcement's investigation was biased against Goynes.

The allegations of Goynes' motion for postconviction relief, even if true, would not have exposed the shortcomings of law enforcement's investigation to a degree meaningfully different than what trial counsel had already done. Thus, the trial record affirmatively shows that trial counsel was not constitutionally deficient and that Goynes was not prejudiced by trial counsel's failure to do more to expose the lack of law enforcement's investigation into someone with dreadlocks as being the shooter.

## 5. Failure to Call Richard to Testify

Lastly, we address Goynes' allegation of ineffective assistance of counsel for the failure to call Richard to testify. Richard allegedly would have testified "concerning Goynes' presence at the barbe[c]ue." Further, Richard "had photos on his phone of Goynes at the barbe[c]ue"—a fact that was established at trial. Without alleging any other supporting facts, Goynes concluded in his postconviction motion that "had Richard been called as a witness, the outcome would have been different in favor of Goynes as his alibi would have been established."

Assuming Goynes' allegations respecting the failure to call Richard as a witness are sufficiently specific, the files and records of the case show that Goynes is entitled to no relief on this claim. Defense counsel called several witnesses to attest that Goynes was at the barbecue when the shooting occurred. The photographs from Richard's phone were entered into evidence. There is nothing in Goynes' allegations respecting the failure to call Richard to testify that raises a reasonable probability that Richard's testimony would have altered the evidentiary picture presented to the jury and, thus, the outcome of the trial.

## VI. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court dismissing, without an evidentiary hearing, Goynes' motion for postconviction relief.

Affirmed.