Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/03/2025 09:09 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
ADAM L. PRICE, APPELLANT.
___ N.W.3d ___

Filed October 3, 2025.    No. S-24-378.

1. **Appeal and Error.** Except for instances of plain error, only those issues both raised or passed upon below and specifically assigned and specifically argued on appeal in the party's initial brief will be considered by the appellate court.
2. **Motions for New Trial: Appeal and Error.** An assignment of error complaining in general terms that the court overruled a motion for new trial is too indefinite and will not be considered on appeal where there were several distinct grounds of error set forth in such motion.
3. **Trial: Motions for Mistrial: Motions for New Trial: Time: Appeal and Error.** When a party has knowledge during trial of irregularity or misconduct, the party must timely assert his or her right to a mistrial to preserve the error as a basis for a motion for new trial.
4. **Trial: Judges: Appeal and Error.** One cannot know of purportedly improper judicial conduct, gamble on a favorable result as to that conduct, and then complain that he or she guessed wrong and does not like the outcome.
5. **Criminal Law: Trial: Juries: Appeal and Error.** Whether a jury is to be kept together before submission of the cause in a criminal trial is left to the discretion of the trial court.
6. **Trial: Motions for Mistrial: Motions for New Trial: Appeal and Error.** A trial court is vested with considerable discretion in passing on motions for mistrial and new trial, and an appellate court will not disturb a trial court's decision whether to grant a motion for mistrial or a motion for new trial unless the court has abused its discretion.
7. **Trial.** Except for excluded judicial proceedings, a ruling by the judicial officer on objections to expanded news media coverage rests within the sole discretion of the judicial officer.

8. **Trial: Appeal and Error.** An appellate court reviews a court's ruling on an objection to expanded media coverage for an abuse of discretion.

9. **Criminal Law: Trial: Juries: Appeal and Error.** To warrant reversal, denial of a motion to sequester the jury before submission of the cause must be shown to have prejudiced the defendant.

10. **Jurors: Jury Instructions: Presumptions.** Jurors are presumed to follow their instructions unless evidence to the contrary is shown.

11. **Trial: Juries: Appeal and Error.** Where the jury is clearly admonished not to do a certain act, the mere opportunity to violate the admonition without any proof of its violation provides no basis on which an appellate court can find that the trial court has abused its discretion in refusing to investigate the jury for such possible misconduct.

12. **Motions for Mistrial: Proof: Appeal and Error.** When attempting to prove error predicated on the failure to grant a mistrial, a defendant faces a higher threshold than merely showing a possibility of prejudice.

13. **Evidence: Appeal and Error.** A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.

14. **Evidence: Proof.** The bar for establishing evidentiary relevance is not a high one; it requires only that the probative value of the evidence be something more than nothing.

15. **Prosecuting Attorneys: Evidence.** The State is allowed to present a coherent picture of the facts of the crimes charged, and it may generally choose its evidence in so doing.

16. **Evidence: Words and Phrases.** Evidence is relevant if it tends in any degree to alter the probability of a material fact.

17. **Rules of Evidence.** Relevant evidence is subject to the overriding protection of Neb. Rev. Stat. § 27-403 (Reissue 2016).

18. **Evidence: Words and Phrases.** Most, if not all, evidence offered by a party is calculated to be prejudicial to the opposing party; unfair prejudice means an undue tendency to suggest a decision based on an improper basis.

19. ____: ____. Unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis.

20. **Evidence: Other Acts: Convictions.** When considering whether evidence of other acts is unfairly prejudicial, courts consider whether the evidence tends to make conviction of the defendant more probable for an incorrect reason.

21. **Judges: Words and Phrases.** A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

22. **Motions to Suppress: Confessions: Constitutional Law: Miranda Rights: Appeal and Error.** In reviewing a motion to suppress a statement based on a claim that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts meet constitutional standards is a question of law, which an appellate court reviews independently of the trial court's determination.

23. **Constitutional Law: Miranda Rights: Waiver: Appeal and Error.** Whether the *Miranda* warnings that were given were sufficient to form the basis of a knowing and intelligent waiver of the Fifth Amendment is reviewed de novo, but whether the waiver, based on the totality of the circumstances, was voluntary is reviewed for clear error.

24. **Miranda Rights: Waiver: Words and Phrases.** A waiver of *Miranda* rights is knowing if it is made with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them.

25. \_\_\_\_: \_\_\_\_: \_\_\_\_. A waiver of *Miranda* rights is voluntary if it is the product of a free and deliberate choice, rather than intimidation, coercion, or deception.

26. **Miranda Rights: Waiver.** Whether a knowing and voluntary waiver of *Miranda* rights has been made is determined by looking to the totality of the circumstances.

27. \_\_\_\_: \_\_\_\_. A waiver of *Miranda* rights need not be express and can instead be implied.

28. **Miranda Rights: Self-Incrimination: Right to Counsel.** The main purpose of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel.

29. **Miranda Rights: Waiver.** *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights.

30. **Miranda Rights: Presumptions.** The law can presume an individual who fully understands the *Miranda* rights and acts in a manner inconsistent with the exercise of those rights makes a deliberate choice to relinquish the protection those rights afford.

31. **Miranda Rights: Waiver.** Once the suspect is informed of and understands the *Miranda* rights, then, at any point in the interrogation, waiver can be implied by the suspect's giving an uncoerced statement.

32. **Self-Incrimination: Police Officers and Sheriffs.** The suspect has the right to control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation, but officers are bound only when the suspect makes a statement that, considered under the circumstances in which it is made, a reasonable police officer would have understood to be a request to cut off all questioning.

33. ____: ____. An invocation of the right to remain silent, which requires police to immediately cut off questioning, must be clear, unambiguous, and unequivocal.

34. ____: ____. An invocation of the right to remain silent must be articulated with sufficient clarity that a reasonable police officer under the circumstances would understand the statement as an invocation of the right to remain silent.

35. **Miranda Rights: Self-Incrimination: Police Officers and Sheriffs.** If an accused makes a statement concerning the right to cut off questioning that is ambiguous or equivocal, or if the accused makes no statement, the police are not required to end the interrogation or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights.

36. **Criminal Law: Self-Incrimination: Appeal and Error.** In considering whether a suspect has unambiguously invoked the right to cut off questioning, an appellate court reviews not only the words of the criminal defendant, but also the context of the invocation.

37. **Confessions: Police Officers and Sheriffs.** The test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear the defendant's will to resist and bring about confessions not freely self-determined.

38. **Constitutional Law: Criminal Law: Confessions.** The use in a state criminal trial of a defendant's confession obtained by coercion—whether physical or mental—is forbidden by the 14th Amendment.

39. **Confessions: Police Officers and Sheriffs.** Coercive police activity is a necessary predicate to a finding that a confession is not voluntary.

40. **Miranda Rights: Self-Incrimination: Police Officers and Sheriffs.** Cases in which a self-incriminating statement was compelled, despite police adherence to the dictates of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), are rare.

41. **Appeal and Error.** Absent plain error, an appellate court considers only those claimed errors both specifically assigned and specifically argued.

42. ____. A generalized and vague assignment of error that does not advise an appellate court of the issue submitted for decision will not be considered.

43. ____. Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.

44. **Courts: Mental Competency: Appeal and Error.** The question of competency is one of fact to be determined by the court, and the means employed in resolving the question are discretionary with the court. The trial court's determination of competency will not be disturbed unless there is insufficient evidence to support the finding.

45. **Motions for Mistrial.** A mistrial is granted when a fundamental failure prevents a fair trial, where an event occurs during the course of a trial that is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.

46. **Juries.** An admonishment of the jury is typically sufficient to cure any prejudice.

47. **Mental Competency.** An explicit competency determination is necessary only when the court has reason to doubt the defendant's competence, and if proceedings do not provide the court with reason to doubt a defendant's competence, it does not err by not conducting a competency hearing.

48. **Sentences: Appeal and Error.** A sentence that is contrary to the court's statutory authority is an appropriate matter for plain error review.

49. **Criminal Law: Legislature: Courts: Sentences.** The power to define criminal conduct and fix its punishment is vested in the legislative branch, whereas the imposition of a sentence within these legislative limits is a judicial function.

50. **Sentences.** A sentence is illegal when it is not authorized by the judgment of conviction or when it is greater or less than the permissible statutory penalty for the crime.

51. **Sentences: Appeal and Error.** An appellate court has the power on direct appeal to remand a cause for the imposition of a lawful sentence where an erroneous one has been pronounced.

52. **Sentences.** A defendant is not entitled to credit for time served against a life sentence.

Appeal from the District Court for Sarpy County: GEORGE A. THOMPSON, Judge. Affirmed as modified.

Cole S. Burmeister and April L. O'Loughlin, Deputy Sarpy County Public Defenders, for appellant.

Michael T. Hilgers, Attorney General, and Nathan A. Liss for appellee.

FUNKE, C.J., MILLER-LERMAN, CASSEL, STACY, PAPIK, FREUDENBERG, and BERGEVIN, JJ.

FREUDENBERG, J.

## I. INTRODUCTION

The defendant appeals from his convictions and consecutive sentences of life imprisonment on two counts of first degree murder of his two young children. On appeal, he challenges the admission of recordings of 911 emergency dispatch service calls and law enforcement body camera footage as needlessly cumulative and unduly prejudicial, his statements to Roman Catholic priests as privileged, and his statements to law enforcement as involuntary and violative of his right to cut off questioning. Also raised on appeal is an incident in which some jurors spoke to a staff member with a "courthouse dog," a biased juror who was excused before trial, and several issues relating to expanded media coverage. Lastly, the defendant challenges his competency for sentencing and the denial of his motion for a mistrial, both based on his epileptic seizure during the defense's case. Additionally, the State argues that the trial court committed plain error by giving the defendant credit for time served on his sentence. We affirm as modified.

## II. BACKGROUND

Adam L. Price's two children were found dead in their beds in his house in Bellevue, Nebraska, in May 2021, during Price's week of visitation. Their mother, Mary Nielsen,

lived in Illinois. The children, Emily Price, age 5, and Theodore Price, age 3, were found after Nielsen became concerned when the arranged daily video call with the children did not take place and she could not reach Price. Price was later located in California. Price was charged with two counts of first degree murder. Price elected to have a jury trial. He was convicted of first degree murder on both counts, and the court overruled Price's motion for new trial, which alleged 15 different grounds of error.

## 1. Evidence at Trial

According to Nielsen's testimony at trial, a couple of weeks before the children's deaths, Nielsen had asked Price if they could return to their original custody agreement. Price said he would think about it. They never revisited the matter.

On Monday, May 10, 2021, Nielsen drove the children to the designated meeting point between her home in Illinois and Price's home in Nebraska, and Price took custody of the children for the week.

Other evidence demonstrated that on the afternoon of May 11, 2021, Price began taking unplanned "well-being time" off work. Price never went back to work.

Nielsen spoke to the children on Tuesday, Wednesday, and Thursday by video call. The last time Nielsen spoke to the children was on Thursday night, May 13, 2021, around 6:20 p.m. Although she did not find it concerning at the time, during that conversation, Nielsen observed Price to be unusually "flat" and "emotionless."

A neighbor testified that earlier that Thursday, around 4 p.m., she observed Price and the children in a park near Price's house. The children were wearing pajamas. Price walked around while the children played. Price and the children left about an hour later.

A different neighbor testified that on that same Thursday, he observed Price taking trash cans to the end of his driveway, even though trash pickup was not until Monday morning.

The neighbor said to Price that it looked like Price was planning on having a long weekend. After a brief pause, Price responded affirmatively.

Financial records showed that on that Thursday night at approximately 7 p.m., Price made three different ATM withdrawals of $500 each. Before that, he put gas in his vehicle. Video footage at the ATM shows some movement from the back seat where Price had the children's car seats.

On Saturday, May 15, 2021, Nielsen became concerned because Price did not initiate the required video call and she was unable to reach Price. She called 911, asking for a welfare check. Officers went to Price's house and observed it to be generally dark. There was no answer when officers rang the doorbell and knocked on the front door. The officers left without entering the house.

On Sunday morning, May 16, 2021, Nielsen again called law enforcement for a welfare check. Again, the house was dark. No one answered when an officer knocked on the door. No vehicles were observed. The trash cans were observed on the curb. The officers again left without entering the house, determining there was no probable cause to do so.

Shortly after the second welfare check, a friend of Nielsen's, Morgan Clark, saw a social media post by Nielsen expressing her concerns for her children and asking if anyone could drive by the house. After speaking with Nielsen, Clark and a mutual friend, Kashe Hall, went to Price's house.

Clark and Hall knocked on the door. When no one answered, Nielsen asked them to go inside. The front door was unlocked. Clark testified she stayed on the phone with Nielsen, who directed them to check Emily's bedroom.

Clark and Hall found Emily lying in her bed, unresponsive. Clark called 911. Soon thereafter, they found Theodore similarly situated in his bed in his bedroom, unresponsive.

Both Emily and Theodore were later pronounced dead at the scene. There were no visible signs of trauma. Both were positioned as if asleep. Emily appeared to be holding

a stuffed giraffe while Theodore appeared to be holding a stuffed teddy bear.

### (a) Nielsen's 911 Calls

The jury heard a recording of Nielsen's 911 calls requesting welfare checks. In the first call, Nielsen calmly explained the situation that she had not heard from Price or her children and requested a welfare check. In the second call, Nielsen explained her continuing lack of contact with the children and inability to reach Price and expressed concern given Price's medical history of epilepsy. Nielsen sounded like she was crying.

### (b) Clark's 911 Call

The jury also heard the recordings of the communications between Clark and the 911 dispatcher. During the call, Clark reported that both children were dead. Hall could be heard crying, and Clark repeatedly expressed fear that Price might come home. They had not searched the house to see if he was still there.

### (c) Responding Officer's
### Body Camera Footage

The jury watched body camera footage of the first officer who arrived at Price's house. The footage showed the officer clearing the house with his gun drawn and brief views of the dead children in their beds from a distance. The officer can be heard cursing.

### (d) Cause of Death

The pathologist who performed the autopsies of Emily and Theodore testified that both children died from asphyxia due to smothering.

Supporting this conclusion, the pathologist found that Emily had pulmonary edema, cerebral edema, and periorbital petechiae in the conjunctiva around the eyes. The pathologist also found small abrasions on Emily's nostrils, indicating

something being placed over the nose and occluding the external airways. Theodore had periorbital ecchymosis and petechiae, cerebral edema, and pulmonary edema.

Blood testing of Emily found no evidence of carbon monoxide or of any of the other forms of poisoning tested for, including boron. Chloroform was not tested for. Theodore did not have enough blood volume for testing.

(e) Evidence Found During Investigation

Investigators searched a trash can and a recycling bin in front of Price's house. There they found liquid ant killer, weed killer, wet strips of cloth with a chemical smell, a belt, and pillowcases. The strips of cloth were not tested.

Also found in the trash were red cards with the phrase "I forgive the person for how they've hurt me and whatever my feelings won't cover, the blood of Jesus surely will," written in Price's handwriting.

It was also discovered that at some point after their separation, Price had adhered to the walls of his house large collages of drawings by the children and photographs. The photographs depicted the children and Nielsen, including maternity pictures.

On the dining room table in Price's house, officers found a book that Nielsen had given Price for Christmas 2018, when they "were in a tough spot" and she was "trying to make things better." On top of the book, officers found Price's wedding band. Nielsen testified that she had asked for the wedding band back.

Also on top of the book was Price's cellular telephone. It had been "factory reset."

A license plate reader system identified Price's vehicle in Reno, Nevada, on Saturday, May 15, 2021. During a later search of Price's vehicle, officers found in the center console approximately $1,500 in cash, several savings bonds, Price's passport, and Price's Social Security card. In the back seat, the officers found a shower curtain.

### (f) Statements to Priests

Price was eventually apprehended in California. While in California, Price spoke with two Roman Catholic priests, Father Ulysses D'Aquila and Father Jerome Foley.

D'Aquila testified that on Saturday, May 15, 2021, around 5:30 p.m., Price rang the doorbell of D'Aquila's rectory in San Francisco, California. D'Aquila had never seen Price before. Price asked D'Aquila if he was a priest, and D'Aquila confirmed that he was. Price asked D'Aquila for a few moments of his time, and D'Aquila took Price into his office and shut the door.

D'Aquila testified that Price seemed "[q]uite distressed." They spoke for about an hour, much of the conversation being theological in nature. The first question Price asked D'Aquila was if "there are any sins so grave that they could not be forgiven."

D'Aquila learned Price had children and said to Price that it seemed as though he might have harmed someone. According to D'Aquila, Price responded affirmatively by nodding his head. Price similarly answered affirmatively when D'Aquila asked Price if he was a fugitive. D'Aquila described that there were "long periods of silence . . . because of his distress." D'Aquila saw Price the next morning during Mass on Sunday, May 16, 2021, and never saw him again.

On that Sunday night, around 5 p.m., Price rang the doorbell at Foley's rectory in Pacifica, California. When Foley answered, Price identified himself as "Jimmy." Foley testified that Price appeared upset. They spoke at the front door of the rectory for about 20 minutes.

At some point during this conversation, Foley asked Price what was bothering him and Price told Foley that "he had killed his children." Foley responded that Price had "to tell someone about this" and asked Price if he wanted to call the police. When Price indicated he did not have a phone, Foley asked if Price wanted Foley to call the police on Price's

behalf and Price said yes. Foley called 911, and Price and Foley went for a walk near the rectory while they waited for law enforcement to arrive.

### (g) Price's Arrest Body Camera Footage

The arresting officer testified that Price was cooperative and polite during his arrest in front of Foley's rectory. The officer's body camera footage was played for the jury, showing the moment of Price's arrest. Price was calm and cooperative during the arrest. He asked the arresting officer how his day was going.

### (h) Statements During Custodial Interrogations

Officers Tom Cumming and Duane Wachtelborn of the Pacifica Police Department conducted an interview of Price on the night of his arrest. Wachtelborn testified at trial as to the substance of Price's statements.

During the interview, Cumming and Wachtelborn spoke with Price about his children. Price described that Emily's favorite stuffed animals were an elephant and a giraffe and that Theodore's favorite stuffed animal was a teddy bear. When speaking about his children, Price referred to them in the past tense.

When asked how long he had stayed with his children after they died, Price said he did not remember. When asked if he had changed the children's clothing after he killed them, Price said he had not. Price indicated he gave Emily her favorite giraffe and Theodore his favorite teddy bear. Price denied hurting anyone else. When asked when was the last time that Price saw his children alive, Price responded, "'[J]ust before I left probably.'" Price said he did not know where his children were at that moment, but "'hopefully they're at peace.'"

Price never directly admitted to killing his children. Wachtelborn described Price's demeanor throughout the interview as "pretty much a flat affect with not a lot of emotional display."

Sgt. Nick Greiner and Det. Zeb Simones of the Bellevue Police Department traveled to Pacifica and interviewed Price there 2 days after his arrest, on May 18, 2021. Greiner testified at trial as to the substance of Price's statements during the interview.

When Greiner asked Price if he regretted what happened in Bellevue, Price responded, "'[A]lways.'" Price clarified that there were no other caretakers during his last visitation with his children and that no one else had harmed his children. Price indicated multiple times during the interview that "he deserved consequences and more." Price also said he deserved to go to prison.

When pressed for more details because Nielsen had a right to know, Price said that Nielsen knew what had happened to the children and that she did not need to know the "intricate details." Price was asked, "'[H]ow did the kids get at peace in the bed?'" Price answered that he relives that moment, but he did not provide details. When asked what caused his children to die, Price said, "'I failed them as a father.'" When asked if he wanted his children to forgive him, Price said that "there's no forgiveness."

Price denied that he had done any research on how to kill his children, so he was asked if he already knew how. Price responded, "[H]ow do you know how to kill someone?" Shortly thereafter, Price made a reference to "angels weeping in the rain." Price denied being angry with his children, and when asked what was going through his mind when he "'made the decision to do something to the kids,'" Price answered, "'God help me. Like everything else, nothing.'" When Greiner said, "'[T]here's no nothing, . . . but you still did it, right? . . . You're still responsible for it,'" Price responded, "'[Y]es, I am.'" When questioned as to whether Price had held a pillow or blanket over the children's noses and mouths or had held them "face down into the bed," Price responded, "Small acts of kindness." Price described that "pure evil had come out of him."

## 2. Jury Instructions, Verdicts, and Sentencing

At the close of all the evidence, the jury was given a step instruction on first degree and second degree murder. The jury was sequestered during deliberations. It found Price to be guilty on both counts of first degree murder. The court sentenced Price to life-to-life imprisonment for each conviction, with the sentences to run consecutively.

In the analysis section, we will provide additional facts where necessary.

## III. ASSIGNMENTS OF ERROR

Price assigns that the trial court erred by denying his (1) motion for jury sequestration as a result of media misconduct; (2) objection to expanded news media coverage; (3) motion to determine competency; (4) motions to suppress statements made to the Pacifica and Bellevue Police Departments in violation of his *Miranda* rights because the statements were not knowingly, intelligently, or voluntarily made, the statements were not freely and voluntarily given, and Price invoked his right to remain silent; (5) motions in limine to exclude the testimony of D'Aquila and Foley as protected by the "priest/penitent privilege"; (6) motions in limine to exclude body camera footage and 911 calls; (7) motion for mistrial after Price was unable to assist counsel due to a medical emergency; and (8) "[m]otion for new trial as a result of the irregularities in the proceedings of the Court, prosecuting Attorney and misconduct of Jurors which ordinary prudence could not have guarded against, and which prevented [Price] from having a fair trial."

## IV. STANDARD OF REVIEW

Due to the variety of standards of review that apply to the assigned errors, we will specifically list the applicable standards of review within each categorical heading set forth below.

## V. ANALYSIS

Price argues on appeal that a new trial is warranted by a pretrial incident where the bailiff delayed disclosure of a biased juror who was excused before trial and a pretrial incident where jurors spoke with the county attorney's office's chief of staff about a courthouse dog. Price argues that a new trial is also warranted by the district court's failure to sequester the jury during the trial due to extensive media coverage, by the court's allegedly erroneous order partially overruling Price's objection to media requests for expanded media coverage, and by an incident in which some jurors' faces were shown in media footage. Price challenges much of the evidence admitted at trial, asserting the 911 calls and body camera footages were unduly prejudicial, his statements to Pacifica and Bellevue police were in violation of his right to remain silent and involuntary, and his statements to D'Aquila and Foley were privileged. Lastly, Price challenges his competency for sentencing and the denial of his motion for a mistrial based on his epileptic seizure during the defense's case. We address each of these arguments in turn.

### 1. Seating Biased Juror

#### (a) Additional Facts

After the jurors were sworn, but before opening statements, the bailiff informed the court that one of the seated jurors had twice informed the bailiff of the juror's concerns about the ability to be fair and impartial. The juror had first expressed this to the bailiff before the jury was impaneled.

The juror was questioned by the judge, the prosecutor, and defense counsel. The juror explained that the juror's brother had been incarcerated for child abuse around the time the juror had young children. The juror said it would be difficult to decide the case based solely on the evidence presented. The juror had not discussed this or anything else with the other jurors. The juror was excused, and an alternate juror was seated.

Defense counsel did not move for a mistrial or otherwise object to the commencement of trial with the jury as impaneled with the alternate juror seated. However, on a break before the prosecution called its third witness, defense counsel raised the issue of the juror who was excused, saying he had been "pondering what occurred this morning." Defense counsel argued that if the defense had known earlier that the juror could not be impartial, it "ultimately might have changed the way [it] picked a jury, might have had to repick a jury, pick a new juror, or excuse them for cause at that point or not." Defense counsel explained they "just didn't have enough facts" and "would ask for a little bit more clarification what all went down."

As a result of this request for clarification, the bailiff was briefly questioned outside the presence of the jury. No new information was obtained from the bailiff, and defense counsel did not make any further motions or objections respecting the incident before the verdicts were rendered.

Following the verdicts, defense counsel stated, as one of the alleged grounds for a new trial, that having a juror sworn and seated after telling the bailiff he could not be fair and impartial reflected misconduct and irregularity in the proceedings impacting Price's right to a fair and impartial jury.

### (b) Standard of Review

[1] Except for instances of plain error, only those issues both raised or passed upon below and specifically assigned and specifically argued on appeal in the party's initial brief will be considered by the appellate court.[1]

### (c) Discussion

[2] Even though the biased juror was excused before opening statements, Price argues seating that juror violated

---

[1] See, *State v. Goynes*, 318 Neb. 413, 16 N.W.3d 373 (2025); *Dycus v. Dycus*, 307 Neb. 426, 949 N.W.2d 357 (2020).

his Sixth Amendment right to a fair trial. As a threshold matter, we find that Price's assignment of error that made global reference to the motion for a new trial, which raised 15 different grounds of error, is insufficient to specifically raise any of those grounds for purposes of appeal. Under Neb. Ct. R. App. P. § 2-109(D)(1)(e) (rev. 2024), the brief of appellant must contain "[a] separate, concise statement of each error a party contends was made by the trial court, together with the issues pertaining to the assignments of error," "[e]ach assignment of error shall be separately numbered and paragraphed," and our "[c]onsideration of the case will be limited to errors assigned and discussed in the brief," with the appellate court having the option to notice plain error. We have held that an assignment of error complaining in general terms that the court overruled a motion for new trial is too indefinite and will not be considered on appeal where there were several distinct grounds of error set forth in such motion.[2] Price's elaboration that the new trial motion was based on "the irregularities in the proceedings of the [c]ourt, prosecuting [a]ttorney and misconduct of [j]urors which ordinary prudence could not have guarded against, and which prevented [Price] from having a fair trial," was insufficient to satisfy the mandates of § 2-109 and our case law requiring that all alleged errors must be both assigned and argued with specificity.

[3,4] Additionally, this alleged error was not preserved below. Citing to Neb. Rev. Stat. § 29-2101 (Reissue 2016), Price asserts that a motion for a mistrial is not a prerequisite for a motion for a new trial and that the incident falls under the statutory grounds of misconduct of the jury and irregularity of the proceedings of the court. Section 29-2101 does not directly address what is required to preserve an alleged error

---

[2] See, e.g., *Pearson v. Schuler*, 172 Neb. 353, 109 N.W.2d 537 (1961); *Allsman v. Richmond*, 55 Neb. 540, 75 N.W. 1094 (1898).

raised in a motion for new trial. We have repeatedly held that when a party has knowledge during trial of irregularity or misconduct, the party must timely assert his or her right to a mistrial to preserve the error as a basis for a motion for new trial.[3] One cannot know of purportedly improper judicial conduct, gamble on a favorable result as to that conduct, and then complain that he or she guessed wrong and does not like the outcome.[4] We turn next to Price's argument.

### 2. Juror Conversation With Chief of Staff Regarding Courthouse Dog

### (a) Additional Facts

Before opening statements, it was discovered that the chief of staff for the county attorney's office, Jean Brazda, had some contact with members of the jury. Brazda was the primary handler of the courthouse dog. Brazda was questioned under oath by defense counsel, outside the presence of the jury, about her juror contact.

Brazda testified that as she was entering her office that morning with the courthouse dog, she happened to pass by four or five individuals in the hallway. Those individuals asked

---

[3] See *State v. Hudson*, 268 Neb. 151, 680 N.W.2d 603 (2004). See, also, *State v. Cotton*, 299 Neb. 650, 910 N.W.2d 102 (2018), *disapproved on other grounds, State v. Avina-Murillo*, 301 Neb. 185, 917 N.W.2d 865 (2018); *State v. Iromuanya*, 272 Neb. 178, 719 N.W.2d 263 (2006); *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006); *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000), *abrogated on other grounds, State v. Mata*, 275 Neb. 1, 745 N.W.2d 229 (2008); *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified on denial of rehearing* 255 Neb. 889, 587 N.W.2d 673 (1999); *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994), *overruled on other grounds, State v. Stolen*, 276 Neb. 548, 755 N.W.2d 596 (2008); *State v. Zima*, 237 Neb. 952, 468 N.W.2d 377 (1991); *State v. Morrow*, 237 Neb. 653, 467 N.W.2d 63 (1991); *State v. Jenson*, 232 Neb. 403, 440 N.W.2d 686 (1989).

[4] *State v. Schreiner*, 276 Neb. 393, 754 N.W.2d 742 (2008).

about the dog, commenting that they had seen pictures of the dog throughout the courthouse.

Brazda responded to questions about the dog's role in the courthouse and the dog's training and abilities. The jurors were permitted to pet the dog. Brazda testified that she did not identify her position with the county attorney's office. She knew the individuals were jurors, but the jurors did not identify themselves as such.

Defense counsel did not move for a mistrial or make any other motion or objection with the aim of impaneling a new jury before trial commenced. After the verdicts were rendered, Price alleged that the interaction between some jurors and a nonattorney member of the county attorney's office about a courthouse dog warranted a new trial.

### (b) Standard of Review

Except for instances of plain error, only those issues both raised or passed upon below and specifically assigned and specifically argued on appeal will be considered by the appellate court.[5]

### (c) Discussion

Price argues that the communication between the chief of staff of the county attorney's office about the courthouse dog was an improper communication equating to and governed by principles of prosecutorial misconduct such that it gave rise to a presumption of prejudice the State allegedly failed to rebut. Even if we assume this error was sufficiently assigned as error through Price's broad reference to the irregularities of the prosecuting attorney and misconduct of the jurors, this argument has not been properly preserved because it was not the subject of a timely motion for mistrial.

---

[5] *State v. Goynes, supra* note 1.

### 3. Objection to Expanded Media Coverage, Motion for Jury Sequestration, and Motion for Mistrial Based on Media Footage of Jurors' Faces

#### (a) Additional Facts

Before trial, Price moved to sequester the jury from the time it was impaneled until it reached its verdicts, with trial estimated to take 2 weeks. In support of the motion, Price provided evidence of extensive media coverage and media articles that included public commentary containing opinions as to the veracity of the proceedings, the court's rulings, and Price's guilt. Price argued that if the jury were not sequestered, then jurors could learn of commentary that could result in unfair prejudice. Although the State appreciated the concerns about media coverage, it argued that sequestration was not logistically viable and that concerns with media coverage could be addressed in voir dire and through court admonishments.

The court denied Price's request that the jury be sequestered from the time it was impaneled until it rendered a verdict. Instead, during voir dire, the court repeatedly admonished the venire not to research, read, watch, or listen to any reports about the case from any sources. Additionally, in its preliminary instructions to the impaneled jury, the court explained that the jury must determine what the facts are by relying solely upon the evidence presented at trial, as well as general knowledge everyone has, and that the jury must disregard any other knowledge about the facts of the case that it may have. The jury was prohibited from using any electronic devices to discover or share information about the case and were instructed to ignore any news reports regarding the case, all of which, the court explained, could be misleading, inaccurate, or incomplete. The jurors were instructed not to let others talk to them about the case, engage in conversations about the case, or to listen to any conversations about the case. Similar admonishments were made throughout the trial.

Price objected to media requests for expanded coverage of the proceedings, including video and photographic equipment. The court sustained the objection in part and overruled it in part, subjecting the grant of expanded media coverage to specified limitations. These limitations included that only one media channel was permitted to have a camera in a fixed position in the courtroom and was responsible for providing pool coverage to other credentialed media whose applications were timely filed and were subject to the court's order. No live or simultaneous video or audio streaming of the trial from within the courtroom was permitted, and no still photography was allowed. Further, use of cameras outside the courtroom was not permitted until a jury was selected and impaneled and no pictures or video was permitted during jury selection, "as the potential for juror identification [was] too great."

Citing the First Amendment, the court denied requests by defense counsel for an order of prior restraint against the members of the press, the parties, and participants.

During the State's case in chief, defense counsel moved for a mistrial after it was discovered that media footage had shown the faces of several jurors leaving the courtroom. A juror brought it to the attention of the bailiff that an acquaintance had sent that juror a text message with a media clip containing a side view of the juror.

All the jurors were individually questioned by the court regarding the incident. The court said on the record:

I will say the incident the Court became aware of — we had — it's pretty innocuous and pretty quick, I believe that somebody that was armed with the knowledge that a juror, a friend, was on the jury, and then you could see the back side of their head going away and put two and two together could make that — that determination. And it appears there was only four individuals, like, the side profile, back of head before it cuts out, and it's in the background.

The court asked the juror who had been sent the media clip if that juror had "[a]ny concern about sitting as a juror on the matter." The juror said, "No." Upon further questioning, the juror elaborated that the incident was not discussed with other jurors or with the acquaintance. None of the other jurors were aware of the media violation, and each expressed no concerns.

The court overruled the motion for a mistrial. Initially, as a result of the incident, the court issued an order prohibiting photography or video from that moment forward. The media was permitted to remain in the courtroom and take notes, but no images were permitted to be shared. Later that same day, however, after a new request from a news station for expanded news media coverage and the court's determination that the media's capture of some of the jurors' images had been inadvertent, the court reinstated its prior order permitting expanded media coverage for the listed entities with the stated limitations, to commence the following Monday. Defense counsel's filing with the court set forth that Price had no objection to the most recent media request from Monday to the end of trial, "as long as the anonymity and confidentiality of the [j]urors and [d]efense team work product are protected."

After the verdicts, Price alleged that the media incident and that the other court rulings relating to media coverage warranted a new trial. He did not ask for an evidentiary hearing or submit additional evidence in relation to the incident. Price also raised in his motion for new trial the court's overruling of his motion to sequester.

### (b) Standard of Review

[5] Whether a jury is to be kept together before submission of the cause in a criminal trial is left to the discretion of the trial court.[6]

[6] A trial court is vested with considerable discretion in passing on motions for mistrial and new trial, and an

---

[6] *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023).

appellate court will not disturb a trial court's decision whether to grant a motion for mistrial or a motion for new trial unless the court has abused its discretion.[7]

[7,8] Except for excluded judicial proceedings, a ruling by the judicial officer on objections to expanded news media coverage rests within the sole discretion of the judicial officer.[8] As a result, and as a matter of first impression, we review the court's ruling on an objection to expanded media coverage for an abuse of discretion.

### (c) Discussion

[9] Price argues the district court abused its discretion by denying his motions to sequester the jury during trial on the grounds that the extensive anticipated trial coverage could have substantially impacted his right to a fair trial. To warrant reversal, denial of a motion to sequester the jury before submission of the cause must be shown to have prejudiced the defendant.[9] Price did not make such a showing.

[10,11] Although Price presented evidence of extensive and prejudicial media coverage, there was no evidence any juror learned of media coverage of the case after the jury was impaneled, with the exception of the one juror who was identified in media footage by an acquaintance. Moreover, jurors are presumed to follow their instructions unless evidence to the contrary is shown.[10] The court in this case gave repeated and thorough instructions and admonishments to the jury to avoid learning anything about the case from any source other than the evidence at trial and to decide the facts based only on the evidence presented during the trial. Price presented no evidence rebutting this presumption. Where the jury is clearly admonished not to do a certain act, the mere

---

[7] See *Kitts v. State*, 153 Neb. 784, 46 N.W.2d 158 (1951).

[8] See Neb. Ct. R. § 6-2003(C) (rev. 2021).

[9] *State v. Garcia, supra* note 6.

[10] *State v. Oliveira-Coutinho*, 291 Neb. 294, 865 N.W.2d 740 (2015).

opportunity to violate the admonition without any proof of its violation provides no basis on which an appellate court can find that the trial court has abused its discretion in refusing to investigate the jury for such possible misconduct.[11] The court did not abuse its discretion by refusing to sequester the jury before submission of the cause.

Price next argues that the district court abused its discretion by overruling his motions for a mistrial and new trial based on the footage of jurors leaving the courtroom in violation of a court rule that states in part: "In all circumstances, expanded news media coverage of all summoned and/or impaneled jurors is prohibited."[12] He argues there was evidence that the juror who had been contacted by an acquaintance about the footage was compromised because that juror's focus, when the event was reported, was shifted from the evidence to whether there would be a mistrial.

This error was not specifically assigned; as discussed, Price's assignment that the court erred in denying his motion for new trial did not satisfy the requirement that any alleged error must be both specifically assigned and specifically argued. However, for the sake of completeness and because our analysis is relevant to Price's specific assignment that the court erred in overruling his objections to expanded media coverage, we will address it.

[12] When attempting to prove error predicated on the failure to grant a mistrial, a defendant faces a higher threshold than merely showing a possibility of prejudice.[13] The defendant must prove that the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice.[14] The fact that there was media coverage of the case does not mean the jurors were aware of it, and it does not prove that

---

[11] See *Kitts v. State, supra* note 7.

[12] § 6-2003(G).

[13] See *State v. Trail*, 312 Neb. 843, 981 N.W.2d 269 (2022).

[14] *Id.*

the improper media footage impacted the jurors' impartiality as to the case.[15] During individual questioning, each juror denied having any concerns about sitting as a juror in the trial. No juror other than the one who had been contacted by the acquaintance was even aware of the incident. The court did not abuse its discretion in denying Price's motion for a mistrial.

For similar reasons, the court did not abuse its discretion in overruling, in part, Price's objections to expanded media coverage. Cognizant of the media interest in the case and the physical limitations of the courtroom, the district court imposed significant limitations on the expanded media coverage. Indeed, although Price objected to expanded media coverage at several points during the trial, he seemed to agree with the court's order granting the requests with restrictions after the incident of the media footage of jurors' faces. Given the court's restrictions on expanded media coverage, the court's instructions and admonitions to the jury, and the jurors' responses during individual questioning, Price has failed to demonstrate he was denied a substantial right and just result because of the court's order regarding expanded media coverage.

Finally, Price argues that the court erred in denying his motion for prior restraint against the members of the press, the parties, and the participants. Price did not specifically assign this ruling as error on appeal, and we find no plain error in the overruling of the motion. We turn next to the challenged evidence that was admitted at trial.

### 4. BODY CAMERA FOOTAGE AND 911 RECORDINGS

#### (a) Additional Facts

Before trial, Price moved in limine to prevent the admission of Nielsen's two 911 calls requesting wellness checks on the children, on the grounds that they were cumulative, they lacked probative value, and any probative value was outweighed by the danger of unfair prejudice via sympathy

---

[15] *State v. McMillion*, 23 Neb. App. 687, 875 N.W.2d 877 (2016).

for the victims and their family. The State argued the 911 calls were relevant to establishing a timeline and the custody arrangement. The court overruled the motion in limine and Price's renewed objection at trial and rejected the admission of the recordings as grounds for a new trial.

Price similarly moved in limine to prevent the admission of Clark's 911 recorded communications on the grounds that any probative value was substantially outweighed by unfair prejudice and could be introduced through Clark's testimony in a way that does not implicate Neb. Rev. Stat. § 27-403 (Reissue 2016). Defense counsel argued that hearing the calls would inflame the jury because Clark and Hall were very emotional during the calls and that Clark and Hall could adequately testify at trial about the relevant information contained in the 911 calls. Price also noted that Clark's fiance had inadvertently become a third party to the call and had expressed concern while speculating that Price might still be in the house and could be dangerous; however, the State agreed to redact the fiance's commentary. The court overruled Price's motion in limine, renewed objection to the admission of the call at trial, and motion for new trial based on the admission of the call.

Price moved in limine to prevent the admission of the body camera footage of the first officer who arrived at Price's house. Price argued the footage would be cumulative of the officer's testimony and unnecessarily extend the length of time for trial. Price further argued that any probative value would be outweighed by the danger of unfair prejudice, in violation of § 27-403, by inflaming the jury and encouraging consideration of irrelevant and inadmissible factors. The court overruled the motion in limine, Price's renewed objection at trial, and Price's motion for new trial that alleged the admission of the body camera footage as one of its stated grounds.

Price also moved in limine to exclude the admission of the arresting Pacifica officer's body camera footage on the

grounds that its probative value was outweighed by the danger of unfair prejudice. The court overruled the motion in limine, Price's renewed objection at trial, and Price's motion for new trial on those grounds.

### (b) Standard of Review

[13] A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.[16]

### (c) Discussion

[14-16] Under Neb. Rev. Stat. § 27-401 (Reissue 2016), "[r]elevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The bar for establishing evidentiary relevance is not a high one; it requires only that the probative value of the evidence be something more than nothing.[17] The State is allowed to present a coherent picture of the facts of the crimes charged, and it may generally choose its evidence in so doing.[18] Evidence is relevant if it tends in any degree to alter the probability of a material fact.[19]

[17] Relevant evidence is subject to the overriding protection of § 27-403.[20] Section 27-403 allows the exclusion of evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.[21]

---

[16] *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017).

[17] *State v. Boswell*, 316 Neb. 542, 5 N.W.3d 747 (2024).

[18] *State v. Vazquez*, 319 Neb. 192, 21 N.W.3d 615 (2025).

[19] *State v. Boswell, supra* note 17.

[20] See *State v. Oldson*, 293 Neb. 718, 884 N.W.2d 10 (2016).

[21] *Id.*

[18-20] Most, if not all, evidence offered by a party is calculated to be prejudicial to the opposing party. Unfair prejudice means an undue tendency to suggest a decision based on an improper basis.[22] Unfair prejudice speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged, commonly on an emotional basis.[23] When considering whether evidence of other acts is unfairly prejudicial, courts consider whether the evidence tends to make conviction of the defendant more probable for an incorrect reason.[24]

### (i) 911 Calls

Price asserts the 911 calls by Clark are cumulative of Clark's testimony and were unduly prejudicial and inflammatory because Clark can be heard in the calls crying and making prejudicial comments about Price. Price does not elaborate as to what the alleged prejudicial comments were, but we assume he refers to her expressions of fear that Price might still be in the house. Price argues that the 911 calls by Nielsen were cumulative of Nielsen's testimony and unduly prejudicial because she sounded "increasingly frantic and emotional" during her second call for a wellness check.[25]

[21] We hold that the court did not abuse its discretion in admitting the 911 evidence. A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[26] The State is allowed to present a coherent picture of the facts of the crimes charged, and it may generally

---

[22] *Id*.

[23] *Id*.

[24] *Id*.

[25] Brief for appellant at 99.

[26] *State v. Cooke*, 311 Neb. 511, 973 N.W.2d 658 (2022).

choose its evidence in so doing.[27] In *State v. Vazquez*,[28] we held that the "emotionally intense"[29] audio of the victim's last moments was not outweighed either by the danger of unfair prejudice or by considerations of needlessly cumulative evidence but was an accurate depiction of a "stark reality"[30] of the crime charged. Similarly, here, the audio reflects the stark reality of the crimes. It was not clearly untenable for the court to find that the calls were relevant and that their probative value was not outweighed by the danger of unfair prejudice or by the consideration of *needless* presentation of cumulative evidence.

### (ii) Body Camera Footage

Price argues the body camera footage of the first officer on the scene that shows the children dead in Price's home was irrelevant, cumulative of the testimony of several witnesses regarding their initial observations of the scene, and unduly prejudicial because the officer's personal observations and commentary only served to inflame the passions of the jury. Price argues the body camera footage of his arrest was unduly prejudicial because it shows him on the ground with his hands behind his back.

Although there was other evidence regarding initial observations of the scene, none gave the perspective of walking through all the rooms of the house and through the yard. In the body camera footage, the officer on the scene can be heard cursing, which was reflective of the stark reality of the situation. The officer did not comment on the crime or on Price.

---

[27] *State v. Rush*, 317 Neb. 622, 11 N.W.3d 394 (2024), *modified on denial of rehearing* 317 Neb. 917, 12 N.W.3d 787.

[28] *State v. Vazquez, supra* note 18.

[29] *Id*. at 221, 12 N.W.3d at 649.

[30] *Id*. at 222, 12 N.W.3d at 649.

As for the footage of the arrest, a similar argument was rejected by this court in *Vazquez*, wherein we held that drone footage of the defendant's arrest, showing a large presence of officers, was relevant and neither unduly prejudicial nor needlessly cumulative of the body camera footage of the defendant's arrest and the arresting officers' testimony.[31] The body camera footage of the officer who arrested Price was prejudicial only inasmuch as it showed the fact that Price was arrested in the customary manner given the nature of the crimes. Price was calm and compliant throughout.

The district court did not abuse its discretion in admitting, over Price's objection, the body camera footage of the officer clearing the scene and of the arresting officer.

### 5. Statements to Pacifica and Bellevue Police

#### (a) Additional Facts

Before trial, Price had moved to suppress his statements to Pacifica and Bellevue law enforcement on the grounds that the statements were involuntary—not knowingly, intelligently, or voluntarily made; were made without a knowing, understanding, and intelligent waiver of Price's *Miranda* rights; and were made after officers failed to scrupulously honor Price's invocation of the right to remain silent. The court overruled the motions to suppress and Price's renewed objections at trial. Price did not raise any alleged failure to record the interviews in their entirety as required by Cal. Penal Code § 859.5(a) (West Cum. Supp. 2025). See, also, Neb. Rev. Stat. § 29-4507 (Reissue 2016). Price raised the admission of his statements to Pacifica and Bellevue police as grounds for his motion for new trial.

#### (i) Pacifica Police Interview

The evidence at the pretrial hearing showed that the interview with the Pacifica Police Department took place on

---

[31] *State v. Vazquez, supra* note 18.

Sunday, May 16, 2021. It began at 9:42 p.m. and ended at approximately 12:39 a.m. It took place in a nonsecure room, and Price was not in restraints. Price was read his *Miranda* rights, which Price indicated he understood. Price was offered water, and he indicated he already had some.

After some preliminary conversation, Pacifica officers Cumming and Wachtelborn asked Price if he would mind talking to them about what brought him to Pacifica that day. Price answered, "Nothing, really." Price was then asked if he could tell them about the conversation he had with Foley, to which Price answered that it was "[n]ot really a conversation." Price elaborated that he was "trying to get a firmer grasp on forgiveness."

A conversation ensued on that topic. There were then some general questions about the children, with Price asking the officer, "What would you like to know?" When asked if Price could tell them how his children were at that moment, Price responded, "Hopefully they're at peace." When asked if Price could help Cumming and Wachtelborn understand what Price meant by that, Price responded, "No, because I don't even understand it, but I don't know. I don't know."

Price explained that the last day he saw his children was a few days prior. When asked in followup to "[t]ell me about" that last day, Price answered, "I'd rather not." Wachtelborn asked, "How come?" Price gave no verbal response. Wachtelborn then asked, "Who are your children with right now, Adam?" Price responded that he did not know.

After some silence to more pointed questions, Price answered at length when asked to describe the last time he saw his children, describing activities the children engaged in when they were still alive. Then Wachtelborn asked, "What happened at the house, Adam?" Price responded, "What do you mean?" When the officers elaborated that they believed Price had brought them there together to tell them what happened to his children and asked if what Foley reported to them was untrue, Price did not respond.

Shortly thereafter, Price initiated a conversation about Price's relationship with the Roman Catholic Church, and Price answered some questions about when he last saw the children alive and how long he was with the children after they died. But when asked about the manner of and the motive for the deaths, Price again became silent. This was followed by Price's initiating a conversation about Emily and Theodore when they were babies. Price explained, "Like, I can talk now. Sorry."

This pattern of Price's answering questions, having periods of silence, and reengaging in less threatening discussion, sometimes initiated by Price, continued throughout the interrogation. At one point, the officers took a break after Price stopped talking and did not respond to the question, "[A]re you going to talk to us anymore?" When the officers returned, Price affirmed that he had had some time to think. Price was asked if he was "going to be able to tell us what happened?" Price responded, "No." Wachtelborn responded, "Your call, man." The interview ended, and Price was taken back to his jail cell.

Wachtelborn testified that at no point during the Pacifica Police Department's interview of Price did he believe Price was invoking his right to remain silent. Specifically, he did not believe Price's periods of silence during the interview were invocations of *Miranda* rights. Instead, they were simply part of a pattern whereby Price "would stare at a photo, not respond and then he would begin speaking. Sometimes he would change the topic. Sometimes he would answer questions."

### (ii) Bellevue Police Interview

The evidence at the pretrial hearing showed that the interview with the Bellevue Police Department took place on Tuesday, May 18, 2021, in the San Mateo County sheriff's investigative office in California and lasted approximately 8½ hours. The interview began at 9:06 a.m. and ended at 5:29 p.m.

Price's handcuffs had been removed. His leg shackles remained on, but he was able to stand up and move around. Before proceeding with the interview, Price was read his *Miranda* warnings, which Price affirmatively indicated he understood.

Price was given a glass of water. Bellevue officers Greiner and Simones conducted the interview. Simones explained that they "just flew out yesterday and arrived late last night, and we were hoping to stop down this morning and — and chat with you for a little bit, . . . if you're up for that." Price responded, "Okay." After discussing background information about his prior employment and how he met his wife and moved to Nebraska, Greiner eventually said, "So I guess it's no secret why we're here," and explained that he understood "it's not easy to talk about some of that stuff that happened," "[s]uch a tragic situation," but that they were "hoping [Price] might be able shed some light on a few things for us." Greiner asked if Price was "willing to help us out with that?" Price answered, "I'll see what I can do. I'm not sure I can be much help."

After discussion of some of the details of Price's journey to California and themes of praying and forgiveness that Price wished to discuss, Simones reminded Price that he said he would help them. Simones asked if Price wanted Simones to ask a specific question or if Price wanted to "kind of paint a picture of what happened." Price responded, "Not much to say on that day, unfortunately." Simones then asked, "[C]ould we just go back to that day in the morning and just kind of talk about how that day went. . . . That sound fair?" Price responded, "Okay, sure."

When questions became more pointed, Price seemed to struggle, and Greiner asked, "[W]hat's got you reluctant?" Price expressed that there was "not much to say on that day." Price answered several subsequent questions by the officers. When the officers explained they would like more

details about exactly "what caused this to happen and how it happened," Price said, "I'd rather not talk about that." When asked in followup, "Well, what do you want to talk about?" Price answered, "I don't know. How was the flight out here?" When pressed again as to why Price did not want to talk about the manner and reason for the children's deaths, Price said, "Because there's nothing to say." When Greiner said, "[T]here's a lot to say," Price responded, "Not anymore." Price engaged in a conversation with the officers about why he might be feeling hesitant. Price said he knew he would be facing consequences, which he deserved, but "[t]here's nothing to say."

Price denied that somebody else harmed the children and spoke about the divorce. When the conversation reached a point where Price was asked for more details about how the children died, he stopped responding. But when the questions turned back to the pleasant activities of the children on the last day they were alive, Price reengaged. Price also answered several questions, albeit vaguely, about what Nielsen had a right to know, and he denied that "this happened" when the children were sleeping or that he acted out of anger. The officers returned to questioning Price about more details, and Price responded with "[y]ou know what happened" and "[t]here's nothing to say." Greiner opined, "There's a ton to say," and he asked, "How'd the kids get at peace in the bed?" Price spoke about continuing to relive that moment and never being able to get away from it and expressed that it would never be possible to understand what happened. Price eventually became quiet again until asked to back up to the more mundane and pleasant activities of the children shortly before their deaths.

Eventually, Price became unresponsive again. When Greiner asked if Price was going to be a "man of [his] word" and help them, Price answered, "I've helped about as much as I can." Simones asked how they were going to resolve

things. Price responded, "There is nothing to resolve. I go to prison and serve my sentence." There followed some discussion about why Price would not provide more details, and Simones said that "we can't put closure on this until we know the details." Price responded, "Everybody finds closure their own way." When Simones suggested that Nielsen deserved closure, Price again said, "She does know what happened"; she just "doesn't know the intricate details." Price said, "But she doesn't need to know that for closure in this."

More discussion continued. Price accepted responsibility for "everything." When the officers tried to get more details, Price said, "I'm thinking about a lot of things." And when asked what Price was thinking about, Price said, "Spaceships and airplanes."

The officers became frustrated. Greiner said that Price was not taking accountability because Price was "selfish" and "controlling." Price nodded his head. The questions and commentary of the officers briefly became more aggressive in tone.

After discussing religious themes introduced by Price, Simones asked why it was so difficult for Price to tell them what he had already told a priest. Price answered, "I don't know. I don't know why they don't — the words don't come out. I've been asking myself that since I . . . ." Price elaborated, "I've always been tongue-tied" and "I get so far and I'm — something is — is stopping me. I don't know why."

Greiner asked if it would help if they just asked questions that required a yes or no answer. Price responded, "I'd say yes, but the past has proven differently." To such questions, Price responded that he did not know if the children died on Thursday and that he did not know how they died. Price was unable to answer whether the children died at the house. He again said, "I don't know why the words don't want to come out," but "I deserve judgment."

Later in the interview, the officers acknowledged to Price that they had gotten "a little irritated." After asking more

pointed questions and getting no response, Simones offered Price food, which he declined. They then took a break. Price was told he was welcome to take a break too, but Price declined. Simones then asked, "You good with us coming back in and chatting a little longer, or what do you want to do?" Price answered, "Either way is fine." The officers told Price to just knock on the door if he needed anything and they would be right back.

When the officers returned, they speculated Price was controlling, and Price acknowledged that Nielsen thought so. Simones expressed that by not sharing the details of what happened, Price was being "selfish as shit," saying, "Because if you don't think that she's going to think about what happened to those two every day of her life, it's almost like you're not human." Greiner then said, "You're a monster." Price was silent in response to several more questions. When Greiner said, "Pretty soon we're going to walk out that damn door, and any chance you had at a little redemption will be gone," Price responded, "My redemption of it is no consequence." Price then affirmed that it was "not all about [him]," and Greiner said, "This is it. This is — you are a narcissist."

There was some subsequent engagement when the officers discussed what the grandparents must be going through. Simones asked, "[W]as you killing the kids more about you or more about the kids?" Price answered, "I don't know what that was about." But Price denied it was because he did not want the children around anymore. In response to another question, Price said the children had done nothing wrong. When again asked what it was about, Price answered, "I don't know." Price was asked, "Why did it happen?" He answered, "That is a question I've been asking." Price continued to engage in the conversation, denying using poison or his vehicle to kill the children and saying he was not sure which child died first.

Price said that ever since he "spoke to those last detectives, I've been asking myself why is it so difficult to get

words out. . . . What color my jumpsuit is, you know? Anything. . . . I want to cooperate . . . ." Price continued, "I want to speak. I want to let this difficult stuff out." Simones said they were not trying to pressure Price to answer the questions. Simones asked if there was something they could do to help Price feel more comfortable and "overcome this." Simones noted, "Your body language shows that you want to continue to talk, but your words stop." Price engaged in further discussion with the officers, saying he was not angry with the children or with Nielsen. When Simones asked Price to "help us make sense," Price responded, "I'm trying to make sense of it myself." When Simones asked what was going through Price's mind "when you made the decision to do something to the kids," Price said, "God help me. Like everything else, nothing."

After answering several more questions, Price again became quiet. Price again explained, "I want to say it. I want to talk." Price said, "There are some things holding me back, and I don't know why. The truth will set you free."

The officers again offered Price food or some water or soda. Price refused. The officers asked Price if they could ask him more questions, explaining, "the ball's in your court." But Price did not answer, eventually stating, "I don't think I'm being very helpful." Greiner asked, "Are you prepared to answer these questions?" Price answered, "After today, I don't think I am. There's something about that day." Greiner responded, "There's something about the day that . . . the kids passed away?" Price answered, "So evil." When Greiner asked what was so evil, Price said, "What they went through that day. Angels were weeping." Simones asked, "Is what you did that day evil? Is that what you're talking about?" Price answered, "Yes." When asked why it was evil, Price said, "Because I did nothing."

The conversation continued until Price took a bathroom break. After that, Price answered more questions but got stuck on some, saying that he "just can't let it out" and telling

himself, "Just say the words." Greiner asked, "Are we ever going to talk about the truth about what happened?" Price answered, "I don't think we will today." When asked why, Price said, "Something about that day." Greiner and Simones expressed some frustration but turned the conversation to Price's phone and electronic mail information. Price was cooperative in giving information about his electronic mail. When again asked if he intended to tell the truth about what happened, Price said, "I'll tell . . . [i]f I can get it out . . . [e]ventually."

Price again declined Simones' offer of food. More conversation took place with Price's continuing to make vague statements, including that he believed he would be going to prison: "[n]obody does a heinous crime and is set free. There's no more going back to mowing lawns and all that" and "I deserve to be punished."

Simones finally asked, "Are we done for today?" Price said, "I guess." The interview ceased.

Greiner testified that although Price had the appearance of someone who had not slept or eaten, Price never asked to sleep, and he declined offers of food. Greiner explained Price was given the opportunity to use the restroom and was offered food or drink at least five times throughout the interview, about every 2 hours. At no point was Price denied requests for a break or sustenance. Greiner testified he had no reason to believe Price could not appropriately answer questions. He seemed alert and responsive during the interview, except for periods when Greiner perceived that Price was intentionally being deceptive by giving unrelated responses to questions or going "mute" for 5 or 10 minutes.

### (iii) District Court's Findings

The district court found that Price was in custody and being interrogated during both interviews. However, in both interviews, Price understood the officers' questions and his statements were not coerced or the product of undue

influence, force, improper inducements, or threats. The court stated that although, "[t]o a very limited extent, . . . Greiner became frustrated and raised his voice" during the interview with the Bellevue Police Department, "[f]or the majority of the interview, the officers were calm" and at no point were the officers threatening. The court concluded that Price's statements were not coerced.

The court found that before being interrogated, in both interviews, Price understood his *Miranda* rights and agreed to speak with law enforcement freely, voluntarily, and knowingly. The court found that Pacifica law enforcement scrupulously honored Price's statement that he no longer wished to speak with them. The court found that at no other point in either interview did Price unambiguously invoke the right to remain silent. Instead, Price repeatedly expressed a desire to speak with law enforcement and reengaged law enforcement at various points during the interviews.

(b) Standard of Review

[22] In reviewing a motion to suppress a statement based on a claim that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*,[32] an appellate court applies a two-part standard of review.[33] Regarding historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts meet constitutional standards is a question of law, which an appellate court reviews independently of the trial court's determination.[34]

[23] Whether the *Miranda* warnings that were given were sufficient to form the basis of a knowing and intelligent waiver of the Fifth Amendment is reviewed de novo, but

---

[32] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[33] *State v. Sutton*, 319 Neb. 581, 24 N.W.3d 43 (2025).

[34] *Id*.

whether the waiver, based on the totality of the circumstances, was voluntary is reviewed for clear error.[35]

### (c) Discussion

Price does not challenge that he was adequately and effectively appraised of his rights before each interview and that he understood those rights. Instead, Price suggests that, before the Bellevue interview commenced, because the Bellevue officers did not ask Price if he wished to waive his rights and speak with them, Price was not given the opportunity to invoke his right to silence. He does not make this argument in relation to the Pacifica interview. Principally, however, Price argues that during both interviews, he unequivocally evoked his right to cut off questioning, which was not scrupulously honored by the officers. Lastly, with respect to both interviews, Price argues that, under the totality of the circumstances, his will was overborne such that his statements were not voluntary. Although Price also argues that the interrogations violated California law because the State failed to prove they were recorded in their entirety, Price did not specifically assign this as error, and we will not address it.

### (i) Waiver of Miranda Rights

Whether the *Miranda* warnings that were given were sufficient to form the basis of a knowing and intelligent waiver of the Fifth Amendment is reviewed de novo, but whether the waiver, based on the totality of the circumstances, was voluntary is reviewed for clear error.[36] These rights must be knowingly and voluntarily waived.[37]

[24,25] A waiver of *Miranda* rights is knowing if it is made with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to

---

[35] *Id.*

[36] *Id.*

[37] See *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018).

abandon them.[38] A waiver of *Miranda* rights is voluntary if it is the product of a free and deliberate choice, rather than intimidation, coercion, or deception.[39]

[26-28] Whether a knowing and voluntary waiver of *Miranda* rights has been made is determined by looking to the totality of the circumstances.[40] A waiver of *Miranda* rights need not be express and can instead be implied.[41] The main purpose of *Miranda* is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel.[42]

Price asserts the Bellevue officers violated the dictates of *State v. Benson*[43] by failing to give him an opportunity to invoke his rights before eliciting statements from him. We observe that Price's argument in this regard is neither clear nor does it appear that he argued it below. In any event, we find that Price waived his *Miranda* rights.

In *Benson*, the defendant was informed of, and expressly waived, his *Miranda* rights, and we rejected on appeal the defendant's argument that the officers' change in interview strategy necessitated that he be readvised of his *Miranda* rights and that he express a further waiver. Citing to *State v. Burries*,[44] we said, "The *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions."[45] We

---

[38] See *id*.

[39] See *id*.

[40] *Id*.

[41] See *id*. See, also, *North Carolina v. Butler*, 441 U.S. 369, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979).

[42] *Berghuis v. Thompkins*, 560 U.S. 370, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010). See *Miranda v. Arizona, supra* note 32.

[43] *State v. Benson*, 305 Neb. 949, 943 N.W.2d 426 (2020).

[44] *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017).

[45] *State v. Benson, supra* note 43, 305 Neb. at 969, 943 N.W.2d at 442.

did not elaborate on what this opportunity was. Likewise, in *Burries*, we did not elaborate on the opportunity referred to therein but cited to the U.S. Supreme Court case, *Berghuis v. Thompkins*,[46] from which the proposition derives.

[29,30] The U.S. Supreme Court in *Berghuis* made clear that *Miranda* does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights. Instead, the law can presume an individual who fully understands the *Miranda* rights and acts in a manner inconsistent with the exercise of those rights makes a deliberate choice to relinquish the protection those rights afford.[47]

[31] The Court elaborated that once the suspect is informed of and understands the *Miranda* rights, then, at any point in the interrogation, waiver can be implied by the suspect's giving an uncoerced statement.[48] The Court explained that "given the practical constraints and necessities of interrogation and the fact that *Miranda*'s main protection lies in advising defendants of their rights," "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."[49]

The Court indicated that said "opportunity to invoke the rights before giving any answers or admissions"[50] was the interrogation itself. The Court explained:

> Interrogation provides the suspect with additional information that can put his or her decision to waive, or not to invoke, into perspective. As questioning commences and then continues, the suspect has the opportunity to consider the choices he or she faces and to make a more informed decision, either to insist on silence or to cooperate. When

---

[46] *Berghuis v. Thompkins, supra* note 42.

[47] *Id*.

[48] See *id.*

[49] *Id*., 560 U.S. at 384, 385.

[50] *Id*., 560 U.S. at 387.

the suspect knows that *Miranda* rights can be invoked at any time, he or she has the opportunity to reassess his or her immediate and long-term interests.[51]

Where there was no contention the defendant did not understand his *Miranda* rights and the defendant was mostly silent during 3 hours of interrogation until officers eventually landed on questions he answered, the Court in *Berghuis* reasoned, "There is no basis in this case to conclude that he did not understand his rights; and on these facts it follows that he chose not to invoke or rely on those rights when he did speak."[52] In other words, said the Court, "he knew what he gave up when he spoke."[53] The Court expressly rejected the defendant's argument that he had invoked his right to remain silent by not speaking for a sufficient period, such that the interrogation should have ceased before he made his inculpatory statements.

Price had the opportunity to waive, and in fact waived, his *Miranda* rights implicitly by responding to various questions throughout the interviews. But we also note that Price explicitly responded, "Okay," when asked if he was up to "chat[ting] . . . for a little bit," and he said he would "see what I can do," when it was explained that the Bellevue officers were hoping Price "might be able to shed some light on a few things for us." We find no merit to Price's argument that he failed to waive his *Miranda* rights during the interview with the Bellevue officers.

### (ii) Invocation of Right to Cut Off Questioning

Price argues that, even if he initially waived the right to remain silent, he later invoked his right to cut off questioning during each interview. We disagree.

---

[51] *Id*., 560 U.S. at 388.

[52] *Id*., 560 U.S. at 385.

[53] *Id*.

[32-35] The suspect has the right to "control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation," but officers are bound only when the suspect makes a statement that, considered under the circumstances in which it is made, a reasonable police officer would have understood to be a request to cut off all questioning.[54] An invocation of the right to remain silent, which requires police to immediately cut off questioning, must be clear, unambiguous, and unequivocal.[55] An invocation of the right to remain silent must be articulated with sufficient clarity that a reasonable police officer under the circumstances would understand the statement as an invocation of the right to remain silent.[56] Otherwise, "police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'"[57] If an accused makes a statement concerning the right to cut off questioning that is ambiguous or equivocal, or if the accused makes no statement, the police are not required to end the interrogation or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights.[58]

[36] In considering whether a suspect has unambiguously invoked the right to cut off questioning, an appellate court reviews not only the words of the criminal defendant, but also the context of the invocation.[59] Relevant facts include the words spoken by the defendant and the interrogating officer, the officer's response to the suspect's words, the speech

---

[54] *State v. Rogers*, 277 Neb. 37, 64, 760 N.W.2d 35, 58 (2009) (internal quotation marks omitted).

[55] See *State v. Hernandez, supra* note 37.

[56] See *State v. Rogers, supra* note 54.

[57] *Berghuis v. Thompkins, supra* note 42, 560 U.S. at 382, quoting *Davis v. United States*, 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994).

[58] See *Berghuis v. Thompkins, supra* note 42. See, also, *State v. Mabior*, 314 Neb. 932, 994 N.W.2d 65 (2023).

[59] See *State v. Clifton*, 296 Neb. 135, 892 N.W.2d 112 (2017).

patterns of the suspect, the content of the interrogation, the demeanor and tone of the interrogating officer, the suspect's behavior during questioning, the point at which the suspect allegedly invoked the right to remain silent, and who was present during the interrogation.[60] A court might also consider the questions that drew the statement, as well as the officer's response to the statement.[61]

The Court in *Berghuis* held that despite almost 3 hours of silence, the defendant never unambiguously invoked the right to cut off questioning. The Court said, "[The defendant] did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his right to cut off questioning."[62]

Price likewise never made these simple, unambiguous statements. Instead, for the Pacifica interview, he argues he unequivocally evoked his right to cut off questioning during the Pacifica interview when he stated he would rather not tell the officers about the last time Price saw his children, followed by several seconds of silence. For the Bellevue interview, Price argues he unequivocally exercised his right to silence by stating that he would rather not talk about "that," after Simones said he wanted to "find out what caused this to happen and how it happened," and Greiner suggested, "That's how your family finds peace . . . . Do you get what we're saying?" Price asserts these statements were largely identical to the statement in *State v. Rogers*[63] that "'I'm not talking no more,'" which we found to be a clear invocation of the right to cut off questioning. Price also argues that his periods of silence during the

---

[60] *Id.*

[61] *Id.*

[62] *Berghuis v. Thompkins, supra* note 42, 560 U.S. at 382 (internal quotation marks omitted).

[63] *State v. Rogers, supra* note 54, 277 Neb. at 45, 760 N.W.2d at 46.

interrogations, combined with these statements, form unambiguous invocations of the right to cut off questioning.

We find no merit to these arguments. When Price said he would "rather not" to the Pacifica officers, it was in response to a specific question to describe in detail something that was apparently painful to him. This was after Price volunteered that he was "trying to get a firmer grasp on forgiveness" and that hopefully his children were "at peace," while saying he could not help the officers understand because Price himself did not "even understand it." Price also voluntarily answered when asked when was the last time that he saw his children, but he said he would "rather not" answer when he was asked to "[t]ell me about that."

When Price said he would rather not talk about "what caused this to happen and how it happened," he was, again, expressing a desire with respect to specific questions. And this was in the context of having explicitly said he was willing to help the officers shed some light on the tragic situation and agreeing to talk about the last day Price saw his children, which he did in detail. Price only became silent when questions approached the children's last moments, with Price explaining they were "hard questions" and that he regretted what happened, but he was forthright in answering questions about whether he had become angry and "snap[ped]." Before saying he would rather not talk about what caused this to happen or how it happened, in order to bring peace to his family, the officers acknowledged that it was understandable Price was uncomfortable talking about certain details.

In general, Price expressed to the officers his willingness to participate in the interviews and was talkative. He also had periods of silence but indicated this was due to an internal emotional struggle to verbalize events that were painful to him, rather than an exercise of *Miranda* rights. Given this context and that the statements at issue were to specific questions, both the Pacifica and Bellevue officers reasonably

understood Price's statements as expressing emotional discomfort with discussing certain topics, rather than an exercise of Price's constitutional right to cut off all further interrogation. Considered under the circumstances in which Price's statements were made, a reasonable police officer would not have understood the statements as requests to cut off all questioning.

### (iii) Coercion

[37,38] Lastly, we address whether Price's statements in the interviews were involuntary. The test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear the defendant's will to resist and bring about confessions not freely self-determined.[64] The use in a state criminal trial of a defendant's confession obtained by coercion—whether physical or mental—is forbidden by the 14th Amendment.[65]

[39] Coercive police activity is a necessary predicate to a finding that a confession is not voluntary.[66] As we have explained, "[t]he prohibition on the use of involuntary confessions is at its core—like other constitutional rights—a limitation on the power of government. Thus, the focus of this inquiry is on the conduct of governmental actors."[67]

[40] Courts examine police conduct in light of the totality of the circumstances, including the tactics used by the police and the details of the interrogation.[68] If the trial judge is satisfied that under the totality of the circumstances, the defendant was able to reason, comprehend, or resist, the statements are

---

[64] *State v. Anthony*, 316 Neb. 308, 4 N.W.3d 393 (2024).

[65] *Payne v. Arkansas*, 356 U.S. 560, 78 S. Ct. 844, 2 L. Ed. 2d 975 (1958).

[66] *State v. Miller*, 312 Neb. 17, 978 N.W.2d 19 (2022).

[67] *State v. Martinez*, 302 Neb. 526, 534, 924 N.W.2d 295, 302 (2019) (internal quotation marks omitted).

[68] *State v. Hernandez, supra* note 37.

to be admitted.[69] Cases in which a self-incriminating state-
ment was compelled, despite police adherence to the dictates
of *Miranda*, are rare.[70]

In support of his argument that his statements to Pacifica
police were involuntary, Price highlights that he had been in
custody approximately 3 hours before the interrogation; he
appeared haggard, malnourished, and tired; he was in a small
room and outnumbered by the two officers; and the tenor of
the officers' interrogation was "clearly hostile and coercive
in nature."[71] In support of his argument that his statements to
Bellevue police were involuntary, Price points to the facts that
he was in shackles and jail issue clothing; he was in a small
room and outnumbered by the two officers; he appeared tired,
hungry, and sleep deprived; the interview lasted approximately
9 hours; and the officers raised their voices, called him names,
and otherwise personally attacked him.

The district court found that, in both interviews, Price's
statements were neither coerced nor the product of undue
influence. The Bellevue interview was lengthy, but we observe
that Price was often the driver of that length, sometimes seem-
ing eager to engage in conversation with the officers. He was
offered food, water, and breaks. As the court found, Greiner
raised his voice and made derogatory comments about Price
"[t]o a very limited extent" over the course of the lengthy
interview. Neither the Pacifica nor the Bellevue officers made
any direct or implied promises. On this record, and considering
the totality of the circumstances, we find no clear error in the
district court's conclusions that Price's statements were volun-
tarily made and were not the product of any coercion, promise,
or inducement, direct or indirect.

---

[69] *State v. Rezac*, 318 Neb. 352, 15 N.W.3d 705 (2025).

[70] See *State v. Sutton, supra* note 33. See, also, *Miranda v. Arizona, supra*
note 32.

[71] Brief for appellant at 55.

### 6. Statements to D'Aquila and Foley

#### (a) Additional Facts

Before trial, Price filed motions in limine to exclude the statements as protected by the "priest/penitent privilege," which the court denied. The court overruled Price's objections to the admission of Price's statements to D'Aquila and Foley. The issue of the admission of Price's statements to D'Aquila and Foley was also raised in Price's motion for a new trial. The parties agreed that California law should apply to the "priest/penitent privilege" question. The court granted Price's motion for choice of law, ruling that California law shall apply in determining Price's motion in limine.

At the hearing on the motion in limine, the court considered the deposition testimony of D'Aquila and Foley and their attached exhibits.

#### (i) Father D'Aquila

D'Aquila testified that before opening the security gate to the rectory, D'Aquila asked if he could help Price. Price asked if D'Aquila was a priest, and he confirmed that he was. D'Aquila described that he wanted to go home and "wasn't welcoming a visit." He asked what he could do for Price, while explaining that "'it's the end of the day.'" Price seemed "rather distraught" and kept insisting, "'I just need a few minutes of your time.'"

Ultimately, D'Aquila decided to let Price in. They went directly to D'Aquila's office, and D'Aquila shut the door. The bookkeeper and the director of religious education were present in the rectory when Price arrived and had been about to go home. They stayed at the rectory out of concern for D'Aquila's safety, but did not exit their offices.

D'Aquila and Price spoke for about an hour in D'Aquila's office in the rectory. The conversation began with D'Aquila's asking Price what he was doing there and Price's asking if there are any sins that cannot be forgiven. Price

continued to ask other general theological questions, but there were also long periods when Price was silent. D'Aquila did not press Price to talk. D'Aquila mostly listened when Price spoke and responded when appropriate.

Price never described what he might need forgiveness for and never asked for forgiveness. D'Aquila testified he was very cognizant of that fact because "I didn't want to be in the position of being asked for absolution," given his intuition that Price was "distraught about . . . something extremely serious." D'Aquila testified that Price never asked to go to confession and that the word "confession" never came up. Again, D'Aquila was very cognizant of that fact "[b]ecause right away I did not want the circumstance to be the sacrament of reconciliation" because he had the impression that Price had done something D'Aquila "would not be able to offer . . . absolution for."

D'Aquila testified that under the tenets and discipline of the church, he did not have a duty to keep his conversation with Price secret. In order to have an obligation to keep the conversation secret, the sacrament of reconciliation must have been initiated by someone asking for permission to confess and must conclude with the priest's giving the prayer of absolution. He testified he has a duty to keep secret conversations that take place during the sacrament of reconciliation but not conversations for spiritual guidance. D'Aquila testified that he and Price did not go through any of the ritualistic processes required for the sacrament of reconciliation and that Price did not ask him to keep their conversation in confidence.

### (ii) Father Foley

Foley testified that when he answered the door to the rectory, Price was standing on the mat outside. He introduced himself as "Jimmy." Price and Foley spoke outside. There were no other people nearby. Price asked if Foley was a priest. When Foley confirmed that he was, Price said,

"'I want to go to confession or talk to somebody.'" Foley responded, "'Well, before we — before confession,'" "'let's talk for a bit.'" Price said, "Okay," and they talked.

Their conversation lasted about 10 minutes. During their conversation, Foley asked Price what exactly was bothering him. Price responded that he had killed his children.

The conversation ended when Price decided they should call the police. Foley said to Price, "'You need to tell somebody about this, the police.' . . . 'Will you do that?'" Price responded, "Yes." When Foley asked Price if he wanted Foley to call the police for him, Price said, "'[Y]es, call them.'" Foley testified he understood from Price that they were calling the police to tell them Price had killed his children.

Price was near Foley the whole time Foley was on the phone with dispatch and up until his arrest. Price did not ask Foley to keep their conversation secret, and Price did not object to Foley's conveying what Price had told him at any point during the 911 phone call or after the police arrived. In fact, Foley observed that once they decided to contact the police, Price exhibited a sense of relief.

Foley testified he had been educated in the "Code of Canon Law," which he was required to follow. He opined his conversation with Price was outside of the rite of confession, since they did not go through any of the necessary rituals and Foley had made clear to Price that they were merely talking. Foley explained that under the doctrines and tenets of the Roman Catholic Church, when a conversation takes place outside of the rite of confession, a priest is not obligated to keep the information secret and nothing in the doctrines and tenets of the Roman Catholic Church prevents a priest from disclosing what was said. General questions about forgiveness or conversations involving spirituality do not involve an obligation to keep the conversation secret, although Foley did not think it would generally be appropriate to "blab" the substance of those conversations "around."

### (iii) District Court's Findings

In determining Price's statements to be admissible, the court found that Price had failed to demonstrate his conversations with D'Aquila and Foley were made in confidence or that D'Aquila or Foley had a duty under the disciplines and tenets of their church to keep secret their communications with Price. The court also reasoned that Price waived any privilege relating to his communications with Foley, because Price, by his conduct, consented to the disclosure.

### (b) Standard of Review

Whether a communication is privileged by reason of its character or the occasion on which it was made is a question of law, which an appellate court resolves independently of the determination reached by the court below.[72]

### (c) Discussion

Neither Price nor the State argues that the district court erred by analyzing the privilege issue under California law. Accordingly, we assume, for purposes of this opinion, that California law governs whether the communications at issue were privileged and whether Price waived that privilege. Under Cal. Evid. Code § 1033 (West 2009), "Subject to Section 912, a penitent, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a penitential communication if he or she claims the privilege."

Under Cal. Evid. Code § 1032 (West 2009), the term "penitential communication" means

> a communication made in confidence, in the presence of no third person so far as the penitent is aware, to a member of the clergy who, in the course of the discipline or practice of the clergy member's church, denomination, or organization, is authorized or accustomed to hear those communications and, under the discipline or tenets of his

---

[72] *Elbert v. Young*, 312 Neb. 58, 977 N.W.2d 892 (2022).

or her church, denomination, or organization, has a duty
to keep those communications secret.

As previously stated, § 1033 states: "Subject to Section 912,
a penitent, whether or not a party, has a privilege to refuse to
disclose, and to prevent another from disclosing, a penitential
communication if he or she claims the privilege."

According to Cal. Evid. Code § 912 (West Cum. Supp.
2025), the privileged communication is waived if

> any holder of the privilege, without coercion, has dis-
> closed a significant part of the communication or has
> consented to disclosure made by anyone. Consent to dis-
> closure is manifested by any statement or other conduct
> of the holder of the privilege indicating consent to the
> disclosure, including failure to claim the privilege in any
> proceeding in which the holder has . . . legal standing and
> the opportunity to claim the privilege.

Under California law, the privilege claimant has the initial
burden of proving the preliminary facts to show the privilege
applies, after which the burden of proof shifts to the opponent
of the privilege to either rebut the presumption of confidential-
ity or show the privilege has been waived under § 912.[73] We
conclude that any penitential communication Price could have
claimed for his disclosures to Foley were waived and that the
admission of his disclosures to D'Aquila was harmless. Thus,
we find it unnecessary to determine whether there was a peni-
tential communication as defined by § 1032.

Apposite to the case at bar is *People v. Johnson*.[74] In
*Johnson*, the California Court of Appeals held that the
defendant had waived any penitent privilege by agreeing
with the minister that calling the police would be the right
thing to do, accompanying the minister to where a police
officer was outside, and standing nearby without objection

---

[73] See *Roman Catholic Archbishop of Los Angeles v. Superior Court*, 131
Cal. App. 4th 417, 32 Cal. Rptr. 209 (2005).

[74] *People v. Johnson*, 270 Cal. App. 2d 204, 75 Cal. Rptr. 605 (1969).

while the minister relayed to the officer what the defendant had told him. The court reasoned, "The fact appellant accompanied [the minister] to the curbside discussion with the officer, having agreed that was the thing to do, would offset, if not totally dispel, the presumption by demonstrating a waiver."[75]

After admitting he had killed his children, Price told Foley he wanted Foley to call the police, agreeing he needed to tell the police about what he had told Foley. This constituted express consent to disclosure. Price's subsequent actions in failing to object at any point during the call with dispatch was conduct that indicated consent to the disclosure.

Price did not consent to D'Aquila's disclosing their conversation to others. However, Price never told D'Aquila what he needed forgiveness for, and we find that the substance of his communications to D'Aquila in evidence at trial was cumulative of his statements to Foley. It was also cumulative of statements made to law enforcement officers in the Pacifica and Bellevue interviews, which, as we have just discussed, were voluntary and admissible. Furthermore, in the Pacifica and Bellevue interviews, Price, "without coercion, has disclosed a significant part of the communication," as described by § 912.

We find no merit to Price's assertion that the district court committed prejudicial error by overruling his objections to the admission of his statements to D'Aquila and Foley.

### 7. Jury Instructions

### (a) Additional Facts

At the close of all the evidence, the jury was given a step instruction on first degree and second degree murder. The jurors were instructed that in determining what the facts are, they must rely solely upon the evidence at trial and that

---

[75] *Id.* at 207-08, 75 Cal. Rptr. at 607.

general knowledge that everyone has and must disregard anything else the jurors knew about the case.

The court denied the defense's proposed step instruction that would include manslaughter during the unlawful act of negligent child abuse. The court also denied the defense's proposed jury instruction on statements to clergy, which provided that the jury could rely on Price's statements to clergy only if the jury found beyond a reasonable doubt that the statements were knowingly, freely, and voluntarily made and were "not [the] result from a communication made in confidence, in the presence of no third person so far as the defendant is aware, to a member of the clergy." Finally, the court denied Price's proposed instruction on consciousness of guilt related to voluntary flight and a definition of "departure."

### (b) Standard of Review

[41] Absent plain error, an appellate court considers only those claimed errors both specifically assigned and specifically argued.[76]

[42] A generalized and vague assignment of error that does not advise an appellate court of the issue submitted for decision will not be considered.[77]

### (c) Discussion

[43] Price did not specifically assign as error the court's jury instructions. Thus, our review of the jury instructions is limited to plain error. Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process.[78] We find no plain error in the court's refusal to give Price's requested instructions.

---

[76] *State v. Montoya*, 304 Neb. 96, 933 N.W.2d 558 (2019).

[77] *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014).

[78] *State v. McSwine*, 292 Neb. 565, 873 N.W.2d 405 (2016).

### 8. General Incorporation by Reference to "Other Assertions" in Motion for New Trial

In his appellate brief, Price attempts to incorporate, by broad reference, all other assertions not specifically argued on appeal but contained in his motion for new trial. He states, "All assertions within the motion for new trial are hereby asserted as error on appeal."[79] We have already explained that Price's assignment of error broadly referring to his motion for new trial was insufficient to satisfy the requirement that the appellant specifically assign any error of the lower court. Likewise, Price's broad reference to a motion made below and the assertions therein is insufficient to specifically argue the alleged error on appeal.

### 9. Motion for Mistrial Based on Price's Medical Emergency and Overruling Motion to Determine Competency Before Sentencing

#### (a) Additional Facts

During the testimony of defense's second witness, defense counsel requested a break. The jury was cleared from the courtroom and informed there would be a short recess. During a discussion in chambers, the court stated, "What occurred is pursuant to prior conversation if [sic] it was indicated that . . . Price might be experiencing a seizure that the word was, Judge, can we take a break."

The nurse who subsequently treated Price testified outside the presence of the jury that Price was quiet and that his vitals were stable. The nurse did not administer any medication at that time but had given Price his daily epilepsy medicine that morning.

Another nurse established that Price had called for help in the middle of the night at jail but that corrections staff

---

[79] Brief for appellant at 86.

"did not feel there was anything emergent going on where they needed to contact [the] on-call medical person at that time."

The court asked Price how he was feeling. Price responded, "Um, migraines. Disoriented. Tired." But he reported that his condition had improved since he met with the medical providers.

The court decided that the trial would be reconvened in 2 hours so that Price could have time to recover. Defense counsel did not object. The jury was notified that the court had a couple of matters to attend to and that they would be starting again after lunch.

During the break, defense counsel sought more information via text message and asked for a report concerning Price's call for help in the middle of the night at the jail. Defense counsel also filed a "Motion for Medical Clearance" based on defense counsel's concern that, due to the medical event during trial, Price was unable to assist in the defense of his case or decide whether to testify in his defense, because he was allegedly disoriented and nonresponsive. The written motion is found in the confidential transcript.

At the hearing on the motion, which took place during the break, defense counsel confirmed the State's understanding that Price was no longer disoriented and unresponsive but was tired. Further, when the State questioned if competency was being raised, as opposed to "just . . . medical," defense counsel said: "I actually don't like the word 'competency.' What we like is that he's able to participate in this trial and aid in the defense of his case. . . . But for — that's what — that's what we're looking for to make sure he's able to do that."

Because the reports of the incident had not yet been completed, defense counsel sought an indefinite continuance to obtain further medical information, as well as the reports from the incident at jail. Defense counsel had secured a doctor to examine Price, and the court explained that it

had been agreed that the doctor would perform the evaluation and hopefully provide testimony about Price's condition that afternoon. The record does not reflect whether that ever occurred.

The jury was excused until midmorning the following day, when the court explained that a medical issue had occurred, which was why they had been abruptly excused earlier. The court explained they were recessing for the rest of the day because more information needed to be gathered about the incident. The jury was admonished that the medical issue was not evidence and that it should not weigh in on the jurors' decision when they ultimately deliberated on the matter.

The following morning, defense counsel orally moved for a mistrial based on the medical incident that occurred the day before at trial. Defense counsel explained, "I just think that puts a little bit of an issue into this trial, and a little bit of an issue whether or not fair and impartiality of the jury trial, just the flow of it . . . ." The defense did not submit any evidence in support of the motion. The State introduced a recorded phone call by Price shortly after the incident, which can be found in the record under seal. The court denied the motion for mistrial and the later motion for a new trial that alleged the same grounds. After the court denied the motion for mistrial due to the incident, the trial recommenced with Price's case in chief and ended with the jury's returning a guilty verdict.

The sentencing hearing was then scheduled to take place approximately 2 months after trial. Before the court proceeded with the sentencing hearing, defense counsel moved for a court order to evaluate Price for the purpose of determining if Price was competent to be sentenced pursuant to Neb. Rev. Stat. § 29-1823 (Cum. Supp. 2024). Defense counsel also moved to continue sentencing until Price's competency and capacity to understand the nature of the sentencing

proceedings could be determined, and so the presentence investigation report could be fully completed.

At the hearing on the motions, defense counsel explained probation had contacted the parties about evaluations they thought might be appropriate. Defense counsel made an offer of proof that initially the defense did not object to proceeding with sentencing, but then there was a delay in uploading the presentence investigation report and a conversation with Price that made defense counsel think "perhaps a competency evaluation would be necessary in order to proceed to sentencing such that . . . Price's competency to be able to be sentenced is fully vetted . . . ." Defense counsel elaborated, "My conversations, without breaking attorney/client privilege, indicated that perhaps [Price] needs to be sure for himself that he is competent to be sentenced today. Again, he's indicated to me — he indicated to me that he's had some questions about some things and he was unsure of some things."

The State explained at the hearing that it had asked probation if there were concerns about Price's competency, and probation had expressed a concern "about his mental state, that an evaluation might be helpful for corrections." The State "took that to mean that it might help them in understanding what they're dealing with when they get there" and "there wasn't a response indicating that he wasn't able to — didn't have the present capacity to understand the nature and object of the proceedings against him and to comprehend his own condition in reference to such proceedings and to make a rational defense."

The only evidence submitted at the hearing on the motion was an exhibit showing the email exchange. It is under seal.

The court denied the motion to determine competency. It explained that the offer of proof was insufficient to require a competency evaluation. It also observed that both convictions carry a mandatory sentence of life to life and that its only discretion was in determining whether those sentences would run consecutively or concurrently.

### (b) Standard of Review

A trial court is vested with considerable discretion in passing on motions for mistrial and new trial, and an appellate court will not disturb a trial court's decision whether to grant a motion for mistrial or a motion for new trial unless the court has abused its discretion.[80]

[44] The question of competency is one of fact to be determined by the court, and the means employed in resolving the question are discretionary with the court.[81] The trial court's determination of competency will not be disturbed unless there is insufficient evidence to support the finding.[82]

### (c) Discussion

Price assigns as error that the court erred in denying his motion for mistrial after Price suffered a medical emergency and was allegedly unable to assist counsel with his defense. He also assigns that the court erred in overruling his motion to determine competency before sentencing.

On his motion for mistrial based on the medical event during the defense's case, Price argues, first, that "the trial court's error in failing to make any additional inquiry of [Price's] ability to knowingly, voluntarily and intelligently participate in his defense, constitutes harmful error."[83] Second, Price argues the court erred in overruling the motion for mistrial because the court failed to inquire whether his seizure in the presence of the jury had a damaging effect impacting Price's right to a fair trial.

[45] A mistrial is granted when a fundamental failure prevents a fair trial, where an event occurs during the course of a trial that is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury

---

[80] See *Kitts v. State, supra* note 7.

[81] See *State v. Haas*, 317 Neb. 919, 12 N.W.3d 787 (2024).

[82] *Id.*

[83] Brief for appellant at 102.

and thus prevents a fair trial.[84] A defendant must prove more than the mere possibility of prejudice when attempting to prove error predicated on the failure to grant a mistrial; the defendant must prove that the alleged error actually prejudiced him or her.[85]

[46] Price has failed to show such a fundamental failure and prejudice stemming from the court's lack of additional inquiry of either Price's competency or the extent to which the jurors witnessed the medical event and were affected by it. Our review of the confidential transcript shows the jury may not have noticed the medical event, and Price did not ask to question the jurors. Indeed, doing so under the circumstances may have only increased the risk of prejudice. Instead, the jury was admonished by the court not to consider the event in its deliberations. An admonishment of the jury is typically sufficient to cure any prejudice.[86] Price did not ask the court to determine Price's competency before moving for a mistrial but filed a "Motion for Medical Clearance" following the medical event. All the evidence presented indicated Price was medically well enough to participate in the trial that continued the following day. The district court did not abuse its discretion in overruling Price's motion for a mistrial on these grounds.

In arguing that the court erred in overruling his subsequent motion to determine competency for purposes of the sentencing hearing, Price argues the court violated its duty to conduct an inquiry into competency mandates under Neb. Rev. Stat. § 29-1822 (Cum. Supp. 2024). As relevant here, § 29-1822(1) provides, "A person who becomes mentally incompetent after the commission of an offense shall not be tried for the offense until such disability is removed as provided in section 29-1823." Section 29-1823(1) states in turn:

---

[84] See *State v. Dixon*, 282 Neb. 274, 802 N.W.2d 866 (2011).

[85] See *id*.

[86] *State v. Davis*, 290 Neb. 826, 862 N.W.2d 731 (2015).

If at any time prior to or during trial it appears that the defendant has become mentally incompetent to stand trial, such disability may be called to the attention of the district or county court by the county attorney or city attorney, by the defendant, or by any person for the defendant. The judge of the district or county court of the county where the defendant is to be tried shall have the authority to determine whether or not the defendant is competent to stand trial. The judge may also cause such medical, psychiatric, or psychological examination of the defendant to be made as he or she deems warranted and hold such hearing as he or she deems necessary. The cost of the examination, when ordered by the court, shall be the expense of the county in which the crime is charged. The judge may allow any physician, psychiatrist, or psychologist a reasonable fee for his or her services, which amount, when determined by the judge, shall be certified to the county board which shall cause payment to be made. Should the judge determine after a hearing that the defendant is mentally incompetent to stand trial and that there is a substantial probability that the defendant will become competent within the reasonably foreseeable future, the judge shall order the defendant to be committed to the Department of Health and Human Services to provide appropriate treatment to restore competency. This may include commitment to a state hospital for the mentally ill, another appropriate state-owned or state-operated facility, or a contract facility or provider pursuant to an alternative treatment plan proposed by the department and approved by the court under subsection (2) of this section until such time as the disability may be removed.

[47] We have said that the language of § 29-1822 directs that "a person shall not be tried for an offense while he is in a state of lunacy or insanity and that sentence, after conviction, shall not be imposed while a person is in that

condition, imposes a duty on but does not go to the jurisdiction of the court."[87] Without touching upon the particulars of an alleged incompetency occurring after the verdict was rendered and before sentencing when the mandatory sentence was life imprisonment, we find that the court did not err. An explicit competency determination is necessary only when the court has reason to doubt the defendant's competence, and if proceedings do not provide the court with reason to doubt a defendant's competence, it does not err by not conducting a competency hearing.[88] Having reviewed the evidence submitted in support of the motion, which is under seal at the request of Price, we agree with the district court that the offer of proof was insufficient to require a competency evaluation.

## 10. Sentencing Plain Error

### (a) Additional Facts

The State argues that the trial court committed plain error by giving Price credit for 1,075 days served on his sentence. The trial court sentenced Price to the statutorily mandated sentence for each conviction, life in prison. The sentences were to run consecutively, with credit for time served.

### (b) Standard of Review

Absent plain error, an appellate court only considers those claimed errors both specifically assigned and specifically argued.[89]

### (c) Discussion

[48-51] A sentence that is contrary to the court's statutory authority is an appropriate matter for plain error review.[90]

---

[87] *Sedlacek v. Greenholtz*, 152 Neb. 386, 389, 41 N.W.2d 154, 157 (1950). See, also, *State v. Saxon*, 187 Neb. 338, 190 N.W.2d 854 (1971).

[88] *State v. Lang*, 305 Neb. 726, 942 N.W.2d 388 (2020).

[89] See *State v. Goynes, supra* note 1.

[90] *State v. Perry*, 318 Neb. 613, 17 N.W.3d 504 (2025).

The power to define criminal conduct and fix its punishment is vested in the legislative branch, whereas the imposition of a sentence within these legislative limits is a judicial function.[91] Accordingly, a sentence is illegal when it is not authorized by the judgment of conviction or when it is greater or less than the permissible statutory penalty for the crime.[92] An appellate court has the power on direct appeal to remand a cause for the imposition of a lawful sentence where an erroneous one has been pronounced.[93]

[52] This court has recognized that a defendant is not entitled to credit for time served against a life sentence.[94] Price was sentenced to two life sentences to run consecutively. Based on this court's precedent, the trial court committed plain error in giving Price 1,075 days' credit for time served. We therefore modify Price's total sentence by removing credit for time served.

## VI. CONCLUSION

For the foregoing reasons, we affirm Price's convictions on two counts of first degree murder and his consecutive sentences of life to life imprisonment. However, we modify Price's total sentence to remove credit for time served.

Affirmed as modified.

---

[91] *State v. Roth*, 311 Neb. 1007, 977 N.W.2d 221 (2022).

[92] *Id.*

[93] *Id.*

[94] *State v. Gleaton*, 316 Neb. 114, 3 N.W.3d 334 (2024).